## Cox *v.* State of Indiana.

[No. 26,045.   Filed October 13, 1931.   Rehearing denied June 10, 1932.]

*Montgomery & Montgomery,* for appellant.

*James M. Ogden,* Attorney-General, and *Merl M. Wall,* Assistant Attorney-General, for the State.

MARTIN, C. J.—Appellant was convicted and sentenced to life imprisonment in the Indiana State Prison under the 1929 kidnapping statute, which reads as follows:

"Whoever kidnaps, or forcibly or fraudulently carries off or decoys from any place within this state, or arrests or imprisons any person, with the intention of having such person carried away from any place within this state, unless it be in pursuance of the laws of this state or of the United States, is guilty of kidnapping, and, on conviction, shall be imprisoned in the state prison during life." Sec. 1, ch. 154, Acts 1929. §2426 Burns Supp. 1929.

Appellant entered a plea of not guilty and a special answer of insanity, to which a reply in general denial was filed. The trial was by a jury, which returned a verdict of guilty as charged. The alleged error relied upon for reversal is the overruling of appellant's motion for a new trial, wherein he contends that the verdict is not sustained by sufficient evidence and is contrary to law.

The evidence of the State is as follows: On Sunday, November 23, 1930, about 3:30 p. m. Gloria Jean Huffer, a seven-year-old girl, was playing with Julia May Aldrich, nine years old, in the yard of the latter's home in the city of Columbus. Appellant picked the Huffer child up in his arms in front of the house near the sidewalk. Immediately she began screaming and crying and kicking terribly to get loose. He forcibly put his hand over her mouth, leaving finger prints on her face and a big red place on her neck, and walked away straight and fast (some witnesses say he ran) with her down an alley. Immediately the Aldrich child screamed, and Mrs. Aldrich, who looked out and saw appellant pass the window,

called to her husband, who immediately started in pursuit. Appellant carried the child 90 or 95 feet, then dropped her in the alley when Mr. Aldrich "hollowed" at him, and started in pursuit and then ran down the alley to where his automobile was parked. Several other men, who testified, hearing the screams and the alarm joined in the pursuit, blockaded the path of his automobile, and captured appellant. A city fireman arrested him and he cursed and fought desperately with great strength until the police arrived and took him in custody. Appellant was somewhat under the influence of intoxicating liquor and there was vomit all over his car.

Three physicians appointed by the court to examine appellant reported that they had examined him physically, asked him various questions to determine his intellectual knowledge of his own acts and his general attitude toward certain conduct and as to his intelligence in general and that in their opinion he was, on November 23, 1930, and at the time of the trial, a person of sound mind.

The defense by its examination of these physicians and by several other of its own witnesses adduced testimony to the effect that the appellant was a moral or sexual pervert; that he had on different occasions accosted a number of little girls 6 or 7 years old on the street, displayed his privates, performed sexual acts in their presence and endeavored to persuade them to get into his automobile; that he had enticed a six-year-old girl by the offer of a nickel to go into a closet with him; and that previously he had been charged with the crime of rape on a nine-year-old girl. The appellant proved that he had stated to the examining physician that his sexual relations began when he was eight or nine years old with a little girl about that age and he continued that as he grew older. Two of the physicians testified that his sex ideal was a small girl; that this perversion

resulted from his experience and mental picture he has carried from early life, and that in seeking to satisfy his desire with his sexual ideal, he might, as an adult, even go to the extent of attempting intercourse with a child of that age. The physicians testified, however, that such a perversion is not insanity and that "this man was not insane upon this particular subject, because he knows the quality of the act, and right and wrong. There is no question as to this man's mental condition. He would be apt to do this thing again because they usually do in these cases."

The appellant contends that the offense charged has not been made out by the evidence, for the reason that "the child was not carried *away* from any *place*." He refers to the history of the offense of kidnapping, showing: (1) That under the common law in order to constitute the crime of kidnapping it was necessary that the kidnapped person be taken into another country (4 Blackstone Com. 219); (2) that under the early statutes of this state kidnapping consisted of taking a person out of the state (See R. S. 1824 p. 142, R. S. 1831 p. 183, R. S. 1852 p. 440); (3) under a later statute of carrying a person away from his place of residence (R. S. 1881, §1915); (4) under a still later statute (Acts 1905 p. 661), and under the present statute (Acts 1929 p. 477)—carrying away "from any place within this state." The history of the statute proves no point for appellant. There are no common-law crimes in Indiana, and the fact that former statutes required a taking out of the state or from a place of residence cannot serve to limit the construction of the term "from any place within this state." A place is any portion of space regarded as distinct from all other space or appropriated to some definite object or use. 48 C. J. 1211. See *Hammell* v. *State* (1926), 198 Ind. 45, 152 N. E. 161. The child kidnapped by appellant was forcibly taken

from the front yard of her playmate's home, and was carried off, violently resisting, down an alley toward appellant's parked automobile. The prompt action of those who heard the cries of the abducted child prevented her further removal, but it is clear to us that her removal from the place where she was playing to a point more than 90 feet down the alley was sufficient to bring the act within the terms of the statute.

The appellant in his brief argues that the penalty inflicted by ch. 154, §1, Acts 1929, §2426 Burns Supp. 1929 is out of proportion to the nature of the offense and therefore in violation of §16, Art. 1, Constitution, §68 Burns 1926, but his assignment of error is not sufficient to present such constitutional question—that must be done by a motion to quash or in arrest of judgment. *De La Tour* v. *State* (1929); 201 Ind. 14, 165 N. E. 753.

The appellant says: "It shocks all sense of justice that a young man should be sentenced to life imprisonment upon the facts revealed by the evidence in this case," but we are pursuaded otherwise by the evidence which he himself introduced in a futile effort to prove himself insane, and which doubtless explained to the jury the motive as well as the gravity of his crime.

Judgment affirmed.

Myers, J., absent.

ON PETITION FOR REHEARING.

MARTIN, J.—The appellant says this court "erred in holding that the constitutionality of a statute cannot be presented on appeal under an assignment (of error) that the (trial) court erred in overruling appellant's motion for a new trial, which motion alleged that the verdict of the jury was 'contrary to law.' "

If the statute upon which an indictment or affidavit is based is unconstitutional, then such indictment or affidavit cannot state facts which constitute a public

offense. "The question of whether an indictment states facts constituting a public offense should be presented by a motion to quash, or a motion in arrest. In this manner only can the rights of the State be properly protected." *State* v. *Beach* (1897), 147 Ind. 74, 43 N. E. 949, 46 N. E. 145, 36 L. R. A. 179; *Guetling* v. *State* (1927), 199 Ind. 630, 158 N. E. 593; *De La Tour* v. *State* (1929), 201 Ind. 14, 165 N. E. 753. The unconstitutionality of a statute cannot be presented by a motion for a new trial on the ground that the verdict is contrary to law. *Guetling* v. *State, supra; De La Tour* v. *State, supra.*

Formerly the sufficiency of an indictment might be questioned for the first time in the Supreme Court on appeal by a defendant without having made a motion to quash or in arrest in the trial court, *Henderson* v. *State* (1878), 60 Ind. 296; *Patteè* v. *State* (1887), 109 Ind. 545, 10 N. E. 421, but, by applying a section of the Civil Code, §89, ch. 38, Acts 1881, as amended by §3, ch. 157, Acts 1911, §366 Burns 1926, the court changed the rule so that it is now held that an indictment cannot be so questioned for the first time in this court. *Robinson* v. *State* (1911), 177 Ind. 263, 97 N. E. 929; *Hay* v. *State* (1912), 178 Ind. 478, 98 N. E. 712, Ann. Cas. 1915C 135; *Robinson* v. *State* (1916), 184 Ind. 208, 110 N. E. 980; *Scherer* v. *State* (1917), 187 Ind. 15, 116 N. E. 52. An assignment of error on appeal in a criminal case that "the indictment does not state a public offense" is not sufficient, *Boos* v. *State* (1914), 181 Ind. 562, 105 N. E. 117, nor is an assignment of error that "the statute upon which the prosecution is based is unconstitutional and void" sufficient. *Alderson* v. *State* (1929), 201 Ind. 359, 168 N. E. 481.

The constitutionality of a statute upon which a prosecution is based will not, according to the weight of authority, be considered on appeal unless the question

as to its constitutionality was raised in the court below. 17 C. J. 53. A statute is presumed to be constitutional and an appellate tribunal will act upon the theory voluntarily assumed in the trial court. Thus in *Fritz* v. *State* (1912), 178 Ind. 463, 99 N. E. 727, the court declined to determine the constitutionality of the act providing for the establishment of hospitals for insane criminals "for the reason that in the trial of the cause the court and the parties assumed the section in question to be a valid enactment."

The phrase "contrary to law," as used in clause 9, §2325 Burns 1926 (which enumerates the causes that may be assigned in a motion for a new trial), means contrary to the principles of law as applied to the facts or issues which the jury was called upon to try and such reason alleged in a motion for a new trial, the overruling of which is assigned as error, is not sufficient to present the constitutionality of the law upon which a prosecution is based. *Ellwanger* v. *State* (1932), *ante* 307, 180 N. E. 287. It follows that we are not required, by the assignment of error made herein, to determine the constitutionality of §1, ch. 154, Acts 1929, §2426 Burns Supp. 1929.

However, considering the fact that the case of *Ellwanger* v. *State, supra,* was not decided until after the instant appeal was taken, the fact that the penalty of life imprisonment has been imposed in this case and the fact that the constitutionality of the act here involved has never been decided, we have determined to consider and decide the appellant's contentions in this regard. He refers to §4343 Burns 1926, making it unlawful to entice or take a child from any institution or home for orphans or dependent or neglected or delinquent children, which crime is punishable by fine and to which may be added imprisonment not to exceed one year, and to §2427 Burns 1926 making it unlawful to

take . . . or entice away a child under the age of 14 with intent to conceal it, which is punishable by fine and imprisonment for not less than two nor more than 14 years, and says: "The offense proved in this case, if unlawful intent be inferred or conceded, is certainly not more serious than the last offense defined, and the imposition of a penalty of life imprisonment shocks all sense of justice and should, if necessary, annul the statute."

Section 16, Art. 1, Indiana Constitution, §68 Burns 1926, provides that "cruel and unusual punishment shall not be inflicted." It has been said in many cases both within and without this jurisdiction, that such a constitutional limitation is directed against the form and character and not against the degree, amount or severity of such punishment as the Legislature shall deem proper for a crime; that it prohibits the infliction of all forms of torture and barbarous punishment,[1] but does not for any offense prohibit imprisonment no matter for what length of time such imprisonment may be. 16 C. J. 1354, §3192; 8 R. C. L. 262, §271; 8 Am. & Eng. Ency. (2d) 440; 35 L. R. A. 453, note. Thus in *Kistler* v. *State* (1921), 190 Ind. 149,

---

*Note 1.* Punishments which in form and character are "cruel and unusual," when measured by the standards of modern civilization, are those which are inhuman, degrading or agonizing and which shock the mind and moral sense of men possessed of common feeling. Examples of such obsolete punishments are the following: Burning at the stake; breaking on the wheel or by the rack; crucifixion; starving or boiling to death; drawing; emboweling alive; quartering; beheading; mutilations; slittings; cutting off nose and limbs; pillories.

The provisions of the national and of state Constitutions prohibiting "cruel and unusual punishment" were originated by the Bill of Rights of 1688 and were inserted as provisions against cruel judgments like those inflicted in the days of the Stuarts and theretofore in the courts of England, and was not intended to limit the general powers of legislatures to define offenses and prescribe their punishments. They are, however, despite their origin, progressive and do not merely prohibit the cruel and unusual punishments known between 1689 and 1787 but acquire wider meaning as public opinion becomes enlightened. §946 Bishop Cr. L. (9th ed.), citing *Weems* v. *United States, infra.*

129 N. E. 625, it was said: "The constitutional provisions, 'cruel and unusual punishment,' are aimed at the form or character of the punishment rather than its severity in respect to duration and amount."

"The word 'cruel,' when considered in relation to the time when it found place in the Bill of Rights, meant not a fine or imprisonment, or both, but such as that inflicted at the whipping-post, in the pillory, burning at the stake, breaking on the wheel," etc. *Hobbs* v. *State* (1893), 133 Ind. 404, 32 N. E. 1019, 18 L. R. A. 774.

Measured by this rule the imprisonment provided for in the statute involved in the instant case is not "cruel and unusual."

Other cases hold that this constitutional limitation is directed against not only cruel, inhuman, and barbarous *forms* of punishment in kind (which are now obsolete), but also against the *degree or amount* of punishment, and that a law which provides for an imprisonment, which, for the crime defined, is, by reason of its length, excessive and wholly unreasonable and so out of proportion to the offense defined as to shock public sentiment and violate the judgment of a reasonable people and so severe as to show an abuse of legislative discretion, may be declared unconstitutional. *Weems* v. *United States* (1910), 217 U. S. 349, 30 Sup. Ct. 544, 54 L. Ed. 793, 19 Ann. Cas. 705; *Fisher* v. *McDaniel* (1901), 9 Wyo. 457, 64 Pac. 1056, 87 Am. St. 971; *State* v. *Becker* (1892), 3 S. D. 29, 41, 51 N. W. 1018; see *Hart* v. *Commonwealth* (1921), 131 Va. 726, 744, 5, 109 S. E. 582; 8 R. C. L. 266, §277; 8 Am. and Eng. Ency. Law 440; Bishop Cr. L. (9th ed.) 697; 16 C. J. 1355, §3192, note 20; note, 35 L. R. A. 564.

In *United States* v. *Borromeo* (1912), 23 Philippine 279, at p. 286, these two groups of authorities are discussed, and the court points out (p. 289), that the view "that courts should not concern themselves with the

relative magnitude of the crime and the penalty is wrong, both in logic and in fact." The court says: "A contrary view leads to the astounding result that it is impossible to impose a cruel and unusual punishment so long as none of the old and discarded *modes* of punishment are used; and that there is no restriction upon the power of the legislative department, for example, to prescribe the death penalty by hanging for a misdemeanor, and that the courts would be compelled to impose the penalty. Yet such a punishment for such crime would be considered extremely cruel and unusual by all right-minded people."

While no case in this state has declared a law to be unconstitutional because the degree or amount of punishment provided therein was excessive or unreasonable, yet the language used in some of our cases indicates that such reason would, in a proper case, be sufficient grounds for so doing. In *Rice* v. *State* (1855), 7 Ind. 332, it was said:

> "If any question can be raised before the judiciary upon the discretion of the legislature under that section [the statute on murder] we concur that it has not been abused in leaving the question of assessing that penalty to the jury."

In *Kistler* v. *State* (1921), 190 Ind. 149, 158, 129 N. E. 625, it was said:

> "Defining crimes and prescribing the limits of punishment to be inflicted is a legislative and not a judicial function. While it is not impossible, yet it is highly improbable, in this day and age, that the courts will be called upon, or feel authorized, to strike down a law, unless it unmistakably and conclusively appears that it carries a punishment shockingly disproportioned to the offense charged."

In *State* v. *Hogreiver* (1899), 152 Ind. 652, 662, 53 N. E. 921, 45 L. R. A. 504, it was said:

> "Natural justice requires that the penalty shall bear some proportion to the nature and circum-

stances of the offense. The legislature is clothed with the power of defining crimes and misdemeanors and fixing their punishment; and its discretion in this respect, *exercised within constitutional limits*," (our italics), "is not subject to review by the courts . . . The graduation of penalties for offenses differing in their circumstances and surroundings is a matter wholly within the competence and discretion of the legislature and in this case we discover no abuse of that discretion."

The crime of kidnapping has always been considered a most serious offense. Under the Jewish law and under the Civil law it was punishable by death. Under the English Common Law, where the crime consisted of forcibly taking a person to a place without the country, it was punishable by fine, imprisonment and pillory. After the definition of the crime was broadened by statute to include any taking by force from a place, the penalty for the crime was reduced. Later, repeated crimes of kidnapping caused our Legislature to enact the severe penalty of life imprisonment for the crime. Within the last two years more than 2,000 kidnapping cases have been reported in 400 cities of the United States, and recently the kidnapping and death of the infant son of Charles A. Lindbergh has shocked and aroused the nation. Courts, as well as legislatures, realize the terrible menace of this crime and the fact that it is being committed, not only by moral perverts, by the mentally unbalanced and by individual criminals, but also by criminals as an organized business or "racket," and courts and legislatures realize the necessity of stamping it out and of inflicting a penalty that will adequately punish those guilty of the crime. We believe that the Legislature, in placing, as a matter of public policy, the punishment for the crime of kidnapping at life imprisonment, has not violated the constitutional inhibition against "cruel and unusual punishment."

The appellant's argument seems to be (not so much that the punishment provided generally in the statute defining the crime of kidnapping is in violation █ of the Constitution, but) that the punishment of imprisonment imposed *in this particular case* is so severe, by reason of its extreme duration, as to be in violation of the Constitution. It has been stated as a general rule, in cases where the objection was to the particular sentence and not to the statute under which it was imposed, that a sentence which is within the limit fixed by statute is not cruel and unusual and is therefore valid. In *Siberry* v. *State* (1895), 149 Ind. 684, 39 N. E. 936, 47 N. E. 458, it was held that, where the punishment assessed against one convicted of involuntary manslaughter was within the maximum punishment for that crime, an objection that it was cruel and excessive could not be sustained in the Supreme Court, and in *Murphy* v. *State* (1884), 97 Ind. 579, it was said: "Even though the punishment assessed against the appellant might seem to be excessive and oppressive, yet we can not disturb the finding of the court on that ground; for the punishment assessed was within the law." In neither of these cases was the constitutional question now before us discussed, but in *Shields* v. *State* (1897), 149 Ind. 395, 39 N. E. 351, the court held that §16, Art. 1, Constitution "has reference to the *statute* fixing the punishment, and not to the punishment assessed by the jury within the limits fixed by the statute." See, also, 8 R. C. L. 264. In the case last cited, as in *Miller* v. *State* (1898), 149 Ind. 607, 49 N. E. 894, 40 L. R. A. 109,[2] and,

Note 2. In *Shields* v. *State, supra,* it was said that "the power to declare what punishment may be assessed against those convicted of crime is not a judicial power, but is a legislative power, controlled only by the provisions of the Constitution." This language was quoted in *Miller* v. *State, supra,* where it was said "no matter how harsh and serve it (the punishment) might

as in other cases in this state and elsewhere, the courts have proceeded upon the theory that constitutional limitations of this character (§16, Art. 1, Indiana Constitution), are directed against the legislative department only, and not against the courts.

Other cases, however, indicate that this constitutional limitation, being contained in the Bill of Rights (as it is in the Indiana Constitution), is directed against all departments of the government, and not merely against the legislative department. *State* v. *Ross* (1909), 55 Ore. 450, 104 Pac. 596, 106 Pac. 1022, 42 L. R. A. (N. S.) 601, appeal dis. 227 U. S. 150, 33 Sup. Ct. 220, 57 L. Ed. 458; *Frese* v. *State* (1887), 23 Fla. 267, 272, 2 So. 1; *McDonald* v. *Commonwealth* (1899), 173 Mass. 322, 53 N. E. 874, 73 Am. St. 293, 295; *Fisher* v. *McDaniel* (1901), 9 Wyo. 457, 64 Pac. 1056, 87 Am. St. 971, 981, 2; *In re Yell* (1895), 107 Mich. 228, 230, 65 N. W. 97; *Southern Express Co.* v. *Walker* (1895), 92 Va. 59, 67, 22 S. E. 809, 41 L. R. A. 436, 439. See, also, *People, ex rel.,* v. *Durston* (1890), 119 N. Y. 569, 576, 24 N. E. 6, 7 L. R. A. 715, 16 Am. St. 859. Regarding our constitutional provision that "cruel and unusual punishments shall not be inflicted," this court in *Hobbs* v. *State* (1893), 133 Ind. 404, 410, 32 N. E. 1019, 18 L. R. A. 774, points out that: "Our law-making power does not *inflict* punishment; it but prescribes the limits of punishment to be *inflicted* by other powers." See *State* v. *Teeters* (1896), 97 Iowa 458, 463, 66 N. W. 754. In *Hobbs* v. *State, supra,* it was said that this pro-

seem to this court, yet, if it was within the limits prescribed by statute for the punishment of such crimes, this court could not interfere nor reverse the judgment."

In *Kistler* v. *State* (1921), *supra,* it was said that the provisions of our criminal code would be greatly endangered by the announcement of a rule which would permit the "overthrow of a law" because of the severity of the punishment as applied to a particular case, and that "this cannot be the law, nor can it be the purpose of these provisions of our Constitution." (§§16 and 18 of the Bill of Rights.) See, also, *State* v. *Moilen* (1918), 140 Minn. 112, 167 N. W. 345, 1 A. L. R. 331, 334, 5.

vision of the Bill of Rights "was . . . adopted as an admonition to all departments," (although it was there indicated that the provision was obsolete "so far as it may admonish the courts against the infliction of punishments so severe as not to 'fit the crime' ").

The courts have seldom found occasion to set aside, as cruel and unusual, punishments inflicted under the provisions of a law, which law in itself is not in violation of this constitutional provision. The reason for this doubtless lies in the fact that courts, or juries (which under §19, Art. 1, Constitution, §71 Burns 1926 "have the right to determine the law and the facts"), do not find a defendant guilty if they believe he does not deserve the punishment provided by law, and by the fact that executive clemency is usually obtained in unusual and deserving cases.[3]  There are cases to be found, however, of defendants who have been found guilty and imprisoned under valid statutes, where courts of appeal have held such imprisonments to be in violation of the Constitution, by reason of their length, they being so severe and so entirely out of proportion to the gravity of the offenses actually committed as "to shock public sentiment and violate the judgment of a reasonable people."  Most of these cases have arisen in instances where courts have abused the discretion given them in fixing the amount of punishment, as in *State* v. *Driver, supra,* or in cases that have involved the sentencing of a defendant for a large number of offenses, the sentences to run consecutively or where imprisonment has resulted from an inability to pay large aggregate fines imposed for a large number of offenses, as *State* v. *Ross, supra,*

---

*Note 3.*  "The judiciary ought to be a complete system, capable of affording every remedy while it has the subject and the party before it. . . . The judiciary ought not to admit, and the pardoning power ought not to suppose, that it has done its work imperfectly."  *State* v. *Driver* (1878) 78 N. C. 423, 2 Am. Crim. Rep. 487.

and *State, ex rel.,* v. *Whitaker, supra.*[4]  But see *State* v. *O'Neil* (1885), 58 Vt. 140, 165, 2 Atl. 586, 56 Am. St. 557; *O'Neil* v. *Vermont* (1892), 144 U. S. 323, 12 Sup. Ct. 693, 36 L. Ed. 450.

If it be granted that this court is required by the Constitution to give relief against a cruel and unusual punishment inflicted under a valid and constitutional law (or if it be granted that it would in an unusual case make an exception to the general rule heretofore announced), we would not disturb the judgment in the case at bar.  We have heretofore set out briefly the facts of this case as established by the evidence offered (principally by the evidence offered in the appellee's behalf).  See opinion filed October 13, 1931, ante 547, 177 N. E. 898.  Under that evidence we could not say that the imprisonment imposed was cruel and unusual for the crime proved.

The attorneys for appellant in oral argument on their petition for rehearing (oral argument having been granted thereon because of an inadvertent failure to grant the original petition for oral argument) contended that the court in its opinion in reviewing the evidence had erroneously stated that appellant, when the pursuit started, "then ran down the alley to where his car was parked," whereas the evidence was that his automobile was not parked in that alley but "was several blocks away and was broken down."  We did not deem it essential to set out à complete resume of the evidence regarding the pursuit, capture and arrest of Cox, but we now

*Note 4.*  In *State, ex rel.,* v. *Whitaker* (1896), 48 L. Ann. 527, 19 So. 457, 37 L. R. A. 561, relators had been committed to the parish prison for 2,160 days in default of paying fines for 72 offenses (destroying plants) in violation of a city ordinance against trespassing in a public park (the offenses embracing one and one-fourth minutes, following each other immediately and consecutively and all occurring within a space of one and two-third hours).  It was held that such a penalty was unusual and unreasonable punishment in the sense of the Louisiana Constitution which provides "excessive fines shall not be imposed, nor cruel and unusual punishment inflicted."

set out in a footnote[5] enough to show generally those facts.  It is true that appellant's car was parked about five squares from the scene of the crime, and that appellant "either didn't want to or couldn't start the car" when the fireman who arrested him wanted to take him to the police station in it.  These facts do not materially change the situation.

Petition for rehearing denied.

Travis, J., concurs in so much of this opinion as holds that the constitutional question is not presented.

Treanor, J., dissents, and is of the opinion that a rehearing should be granted.

*Note 5.*  After dropping the Huffer girl, Cox ran north in the alley on the east side of the Aldrich house to the first alley where he turned west.  He ran to Eighth Street and then walked.  He stopped at the Catholic church and leaned over the fence, apparently sick.  Then he crossed the street and continued walking west.  Aldrich directed two boys to telephone for the police and started in pursuit of Cox.  Huffer and Veenebol caught up with Aldrich, at Sycamore Street, and the three caught up with Cox at the Methodist Church at Eighth and Lafayette Avenue.  Huffer grabbed Cox and they went down together.  Cox struggled, fought and broke away from the pursuers.  He ran west pursued by the three men and two others who had joined them.  When Cox got to Pearl Street he ran north and hid between two houses.  He again escaped from his pursuers, ran down the alley and got in his car which was just off Franklin on Eighth Street.  He leaned over with a newspaper over his face and had been vomiting.  The pursuers stopped some cars so he could not get his car out and waited for the police.  A city fireman came up and arrested Cox.  Cox upon request could not or did not start his car and the posse started with him on foot toward the police station.  At Sixth Street he tried to break away again and they held him down until the police arrived and took him in custody.