# Richmond

## THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, A CORPORATION v. CITY OF RICHMOND.

April 23, 1945.

Record No. 2921.

Present, All the Justices.

The opinion states the case.

*W. W. Beverley* and *R. Carter Scott, Jr.*, for the plaintiff in error.

*Horace H. Edwards, J. E. Drinard* and *William S. Cudlipp, Jr.*, for the defendant in error.

*W. C. Pender* amicus curiae.

SPRATLEY, J., delivered the opinion of the court.

This is a proceeding instituted by The Great Atlantic and Pacific Tea Company, a corporation, hereinafter called the Company, for relief from an additional assessment of license taxes for the year 1939, amounting to $9,032.02, imposed upon it under an ordinance of the city of Richmond, here-

inafter called the City. From an order denying full relief this writ of error was granted.

The facts are not in dispute. A correct determination depends upon a proper construction of the city ordinance and its application to the facts. The pertinent provisions of the ordinance are as follows:

"For each distributing house or place in this city (other than the house or place of manufacture) operated by any person, firm or corporation engaged in the business of a merchant in this city, for the purpose of distributing goods, wares and merchandise among his or its retail stores, a separate merchant's license shall be required, and the goods, wares and merchandise distributed through such distributing house or place shall be regarded as purchases for the purpose of measuring the license tax, which tax shall be the same as the license tax imposed by this section on a wholesale merchant".

In another section the license tax of a wholesale merchant is measured by the amount of purchases made by him during the preceding year. The City also levied a license tax on retail stores based on the amount of their sales.

A somewhat lengthy statement of the facts is necessary to a comprehensive understanding of the case.

The Great Atlantic and Pacific Tea Company is a chain store corporation organized under the laws of Arizona. Its business is purchasing, distributing and selling food supplies and other mechandise and also manufacturing and processing some merchandise. It has offices and warehouses for the distribution of its goods and products, which it sells through many retail grocery stores owned and operated by it in Virginia and in other States. It is not engaged in business as a wholesaler nor does it distribute its merchandise other than to its own retail stores.

In 1938 and 1939, the Company operated approximately 21 retail grocery stores in the city of Richmond and approximately 100 similar stores in the State of Virginia, whose records of sales and purchases were kept in the office of the Company at Richmond. During the same years it operated

2 warehouses in the City, closely adjoining each other, an office and purchasing department on the second floor of one of the warehouses and a traffic department in the other. The warehouses were situated on the main line and side tracks of a railroad and were used for the receipt and storage of merchandise shipped to the Company by railroad cars and motor trucks. The merchandise so received and stored was delivered or shipped from the warehouse to the Company's retail stores upon orders from the managers of those stores. At its office, and in its purchasing and traffic departments there were handled, kept and prepared all the records relating to the distribution and delivery of merchandise from warehouse stock or otherwise, to its retail stores in the city, in the State, and beyond the borders of the State.

In 1938, the Company received and physically stored in its warehouses and distributed therefrom to its retail stores in the City and State merchandise costing it $4,360,857. In the year 1939, it paid to the City, a distributors license tax for that privilege based on the above amount. It also paid the city license taxes on its retail stores.

In 1938, the Company also distributed among, or caused to be delivered to its retail stores additional merchandise of the cost value of $4,101,369, by the six following methods:

(1) It received and physically stored in its warehouses and distributed therefrom among its stores outside of the State of Virginia merchandise which cost $281,080;

(2) It caused to be distributed by direct shipments to its retail stores merchandise of the value of $575,000 from its various subsidiary corporations located outside of Virginia. This merchandise consisted of Quaker-Maid products and coffee, of which 90% was shipped and delivered to retail stores located outside of Richmond. The method used in distributing this merchandise, as described in the brief of the City, was as follows: "Letters were sent from the Richmond office addressed to the managers of the retail stores requesting them to order merchandise needed by them for sale to customers. The store managers sent to

the Richmond office orders for such merchandise and at the office the orders were assembled and a determination made whether or not the orders were sufficient in quantity to make up a minimum or maximum carload. When that was determined the orders were sent by the office to subsidiary plants of the Company situated outside of the State. The merchandise was shipped by the subsidiaries and upon its arrival at the place of destination in the City or the State, the Richmond office arranged with transportation companies to take the merchandise from the railroad cars in which it was shipped and to deliver it to the retail stores ordering it. No payment was made by the Richmond office for this mer-- chandise. The subsidiaries billed the Richmond office on a 'warehouse contract', or 'memorandum invoice', which the subsidiaries issued to charge Company's account and credit their merchandise account, and which the Company used to credit its subsidiaries' account and to charge its merchandise account. The Richmond office handled all of these transactions and kept all records pertaining thereto".

(3) It caused to be distributed among its retail stores in the City and State sugar of the value of $606,877, approximately 80% of which was shipped and delivered to retail stores outside of the city of Richmond. This merchandise was delivered in the following manner: "Pursuant to arrangements made by the Richmond office sugar refineries located outside of the State maintained at several points in the State stocks of sugar in warehouses engaged by the refineries for the convenience of the Company. The retail store managers sent orders for sugar as needed to the Richmond office. Company's traffic department sent the orders to transportation companies engaged by its Richmond office for the purpose with written authority to take the sugar from the refineries' warehouses and to deliver it to the retail stores. This merchandise was billed to the Company by the refineries and paid for by its New York office which in turn billed its Richmond office by 'memorandum invoice'. The Richmond office, with the exception of paying for

the sugar, handled all of these transactions and kept the records pertaining thereto".

(4) It distributed or caused to be delivered to its retail stores in the City and State canned goods of the value of $798,000, 80% of which was delivered to stores outside of the City. The following method was used for this distribution: "The Richmond office requested the retail store managers for orders for such merchandise. The orders were sent by the managers to the Richmond office where they were assembled and it was determined whether or not there was a sufficient quantity in the aggregate to make up a carload. The Richmond office, when a sufficient quantity was ordered by the retail store managers, placed orders with manufacturers or producers for the merchandise to be shipped to designated points in the City and in the State. Company's traffic department engaged transportation companies to unload the cars upon reaching the points of destination and the orders assembled by the Richmond office were delivered to the transportation companies with directions to deliver the merchandise to its retail stores. This merchandise was paid for by the Richmond office by checks drawn on Richmond banks. When freight was a part of the contract of purchase of the merchandise it was also paid by the Richmond office by checks drawn on Richmond banks. The Richmond office handled all of these transactions and kept all records pertaining thereto".

(5) It caused to be delivered to its retail stores in the City and State merchandise of the value of $1,680,000. The method adopted was as follows: "Salesmen representing manufacturers, or producers of foodstuffs authorized and approved by Company's Richmond office. called on the managers of its retail stores soliciting orders for their products. The retail store managers ordered whatever of this class of merchandise was needed and it was delivered to the retail stores by the vendors. The Richmond office had nothing to do with the procurement of this merchandise. Bills therefor were sent to the Richmond office by the vendors for pay-

ment and payment was made therefor by the office by checks drawn on Richmond banks".

(6) It caused to be delivered to its stores in the State, but outside of the City, merchandise of the value of $160,412 under the following method: "Representatives of or producers themselves called on the managers of the Company's retail stores and solicited orders for their products. The managers ordered whatever of this class of merchandise was needed and it was delivered direct to the retail stores by the vendors and paid for by the store managers who recorded the transactions and sent the records thereof to the Richmond office each week".

Additional facts are accurately summarized as follows:

"The City operates an agency of its government known as a License Bureau whose activities are supervised by its License Inspector. It is the duty of this officer to investigate the assessment and payment of license taxes by licensees and others against whom assessments should be made under the City's tax laws. In the performance of these duties investigations and audits are made of returns filed by merchants with the Commissioner of the Revenue showing the amount of purchases made by them as a basis for the assessment of license taxes against them. There are annually approximately 10,000 business and professional licensees in the City. Of these in the year 1940 there were 384 persons, firms and corporations doing business as wholesale merchants in the City. In the year 1940, the License Inspector certified to the Commissioner of the Revenue 117 additional assessments of license taxes against wholesale merchants aggregating approximately $56,000.00. These additional assessments were made because of the decision of the United States Supreme Court in the case of *McGoldrick* v. *Berwind-White Coal Min. Co.*, 309 U. S. 33, 60 S. Ct. 388, 84 L. Ed. 565, 128 A. L. R. 876, and pursuant to the opinion of State Tax Commissioner Morrissett, contained in a communication addressed to all Commissioners of the Revenue in the State under date of March 18, 1940, which instructed them in assessing wholesale merchants with license

taxes to include the cost value of merchandise shipped by or for them from points without the State to points within the State and the cost value of merchandise shipped by or for them from points within the State to points without the State and the cost value of merchandise shipped by or for them from points within the State to points within the State, commonly known as drop shipments. Shipments of this character consisted principally of merchandise ordered by a wholesale merchant from a principal and shipped to destinations other than the place of business of the wholesale merchant placing the order. The cost value of merchandise falling within the class of drop shipments were included in the basis for making the additional assessments of license taxes paid by these wholesale merchants.

"In the year 1942, the License Inspector discussed with State Tax Commissioner Morrissett the propriety of including in the volume of business done by operators of retail chain stores, the cost value of merchandise distributed to the retail stores by the operators thereof that did not physically reach and physically pass through warehouses maintained by these operators. The matter was also at that time discussed with the City's City Attorney. As a result of these conferences the License Inspector directed an auditor to investigate and review the records of petitioner and others engaged in like enterprises, particularly those of petitioner's chief competitor, Safeway Stores. At the time of trial the audit of the records of Safeway Stores was about complete and an additional assessment of license taxes for the year 1939 against this chain store operator was in course of preparation based upon the cost value of merchandise distributed through or by means of a house or place maintained in the City aggregating approximately $1,000,000.00.

"Additional assessments of license taxes were also made in the year 1940 for the years 1937 through 1940 against others who operated more than one retail store and who distributed merchandise among their retail stores, that did not physically reach or pass through warehouses maintained by them in the City.

"As a further result * * , a memorandum of assessment of an additional license tax against the Company was prepared for the privilege of maintaining a place in the City in the year 1939 for the distribution of merchandise through or by means of such place among Company's retail stores of $9,-032.00. Such additional assessment was based upon merchandise having an aggregate cost value to the Company of $4,010,373.00. The cost value used as the basis for the additional assessment is the aggregate cost value of merchandise distributed through or by means of or delivered to Company's retail stores by the methods hereinbefore described. Such cost value was not reported by the Company to the Commissioner of the Revenue for assessment of the license tax for the year 1939 and the Commissioner of the Revenue had no knowledge of such fact nor had there occurred any event upon which the Commissioner of the Revenue could or should have obtained such knowledge until the memorandum of the additional assessment was delivered to him. Upon receipt of such memorandum the additional assessment was made by his office.

"The License Inspector testified upon interrogation by the trial court that assuming that the Company had no warehouses in the City but handled the distribution of merchandise to its retail stores through or by means of the Richmond office in the manner herein described, the assessments still would have been made because the Richmond office is a 'place' within the meaning of the ordinance declaring that for each 'distributing house or place' operated by the Company for the purpose of distributing its merchandise among its retail stores 'a separate merchant's license shall be required' ".

The Company, upon being notified of the additional assessment of $9,032.02, based upon the foregoing six items, promptly filed its petition praying that it be held illegal and void and that the Company be exonerated from the payment of each and every part thereof.

The Company attacks the validity of the additional assessment upon the grounds that the words "distributed

through" in the ordinance mean that the merchandise must have been physically delivered to its warehouses and physically distributed through its warehouses to its retail stores, that the words "distributing house or place" means a warehouse, and that unless the words receive such construction the statute will operate to discriminate against it. It further contends that the assessment is unreasonable, arbitrary and in violation of the State and Federal Constitutions.

In support of its first ground it says that its construction of the ordinance is in accord with the legislative intent in enacting the ordinance and the construction which the city officials, charged with its enforcement placed upon it for many years; and that, as a matter of fact, the additional assessment was upon the cost value of merchandise which was not distributed through any warehouse, distributing house or place operated by it in the city of Richmond to any of its retail stores in the State of Virginia, except merchandise of the cost of $281,080, which was stored in its warehouses in Richmond, and distributed to its stores located outside of Virginia.

The trial court, in a written opinion made a part of the record, upheld the ordinance as constitutional, construed its language to include the larger portion of the merchandise covered by the assessment, and found that the evidence failed to show any discrimination against the Company.

The rulings of the court and the basis for its rulings were as follows:

(1) That the assessment upon the item of $281,080, the cost of merchandise which was physically received and physically passed through the warehouses and distributed to the company's retail stores outside of the State through their warehouses, was correct.

(2) That the merchandise valued at $575,000 acquired by the Company from its subsidiaries outside of the State was distributed, allotted and apportioned through or by means of the Richmond office, "a place" in that City. That its Richmond office did all that was necessary or expedient

to get the merchandise to the retail stores of the Company without having the merchandise physically brought to its warehouses in the City, and that the assessment thereon was correct.

(3) That the merchandise costing $606,877, consisting of sugar acquired from refineries' stocks in Virginia, was likewise distributed, allotted or apportioned through or by means of the Richmond office, and that the assessment based thereon was correct.

(4) That the merchandise costing $798,000, consisting of canned goods acquired by the Company, was likewise distributed, allotted or apportioned by the same method and that the Richmond office of the Company did everything necessary, including the payment therefor, to get this merchandise to its retail stores without the merchandise being physically brought to its warehouses in the City, and that the assessment based thereon was correct.

(5) That the merchandise costing $1,680,000, acquired by the Company through orders placed by its retail store managers and shipped directly to its retail stores from goods in which the plaintiff in error had no interest, was not distributed, allotted or apportioned through or by means of its Richmond office; that the only thing done by the Richmond office with respect to this merchandise was to verify the signatures of the plaintiffs and to pay for it; and that the assessment based thereon was erroneous; and,

(6) That the merchandise costing $160,412 was acquired by the Company through purchases made by its retail store managers; that this merchandise was paid for by the store managers; that its Richmond office had nothing to do with the acquisition of this merchandise; and that so much of the assessment as was based upon such cost value was erroneous.

The City made no objection or exception to the ruling of the court with respect to the last two named items.

Section 188 of the Tax Code of Virginia is a statute levying an annual license tax on merchants providing for the levy and assessment of annual license taxes by the State

against merchants, wholesale and retail, for the privilege of doing business in the State graduated by the amount of purchases of goods, wares and merchandise made by them during each preceding calendar year. The General Assembly, in 1928, after receiving the report of a commission appointed to collate, revise, simplify and codify the general tax laws of the State, amended the merchants license statute by adding to Section 188 the following paragraph:

"For each distributing house or place in this State (other than the house or place of manufacture) operated by any person, firm or corporation engaged in the business of a merchant in this State for the purpose of distributing goods, wares and merchandise among his or its retail stores, a separate merchant's license shall be required, and the goods, wares and merchandise distributed through such distributing house or place shall be regarded as purchases for the purpose of measuring the license tax. Acts 1928, Chap. 45, page 124.

The reasons given by the commission for recommending the enactment of this paragraph are given in its report as follows:

"The last paragraph of section 188 is new and is intended to equalize the tax burden as between the operator of many retail places of business on the one hand and the operator of only one retail place of business on the other. In the former class of cases the merchant usually has a distributing warehouse and only pays on his purchases when the purchases are distributed among his retail stores as purchases for such stores. In the latter class of cases, that is, the merchant who has only one place of business or the merchant who has no distributing warehouse the merchant buys from the regular wholesalers in this State which wholesalers pay the regular taxes measured by their purchases, so that when the goods reach the consumer two taxes have been collected, one from the wholesaler and one from the retailer. The failure of the law to require a separate merchant's license 'for every distributing house or place in the State (other than the house or place of manufacture) operated by any

person, firm or corporation engaged in the business of a merchant in this State for the purpose of distributing goods, wares and merchandise among its retail stores'—operates to place the chain store merchant at a marked advantage over the ordinary retail merchant, and enables the chain store merchant to undersell the ordinary retail merchant, certainly to the extent of the additional taxes which the ordinary retail merchant must pass on to the consumer. The commission regards the existing law on this subject as unfair, and as giving the chain store an advantage over the regular wholesaler and retailer. It should be remembered that the reason why the regular wholesaler and retailer are put to the disadvantage is that the joint tax burden on them is heavier, and that all of the people of the State benefit by reason of the additional taxes paid by such regular wholesaler and retailer".

On April 22, 1930, the City first adopted its ordinance for the levy and assessment of license taxes on each distributing house or place in the City.

In 1934 (Acts 1934, Chap. 137, page 192) the General Assembly struck out the period at the end of the last paragraph of Section 188 of the Tax Code, quoted above, inserted a comma, and added "which tax shall be the same as the license tax imposed hereby on a wholesale merchant".

On November 15, 1935, the council of the city of Richmond added the above quoted clause to the City's ordinance, thereby bringing the tax laws of the City relating to wholesale merchants and distributors in exact conformity with those of the State.

It is apparent, we think, that the purpose of both Section 188 of the Tax Code and the ordinance of the City is to increase the revenue of the State and City and equalize the competitive opportunities of both wholesale and retail merchants.

This purpose and intent was further evidenced by the amendment of the ordinance in 1934 which eliminated inequality and discrimination between wholesale merchants and

those who came into competition with them in the distribution of merchandise to retailers. Prior to the enactment of Section 188 of the Tax Code of Virginia there was no distinction between wholesale and retail merchants in the assessment of their license taxes. The taxes were based upon the amount of purchases made by them during the preceding year. (Acts 1928, page 120). In 1934 wholesale and retail merchants were separately classified. The basis for the license tax of a wholesale merchant was unchanged but the license tax of a retailer was to be thereafter measured by the amount of sales made by him during the preceding year, and the tax on each distributing house or place was prescribed to be the same as the license tax therein imposed on a wholesale merchant, as to goods, wares and merchandise distributed through his or its distributing house or place.

A distributing house or place performs the same functions as a wholesale house or market, and it is fair and reasonable to classify both of such businesses in the same category. It being impossible to adopt an iron rule of equal taxation or to prevent differences in taxation, it is sufficient that the classifications and the rates be fair and reasonable. *Commonwealth* v. *Bibee Gro. Co.*, 153 Va. 935, 151 S. E. 293, and *Great Atlantic, etc., Tea Co.* v. *Morrissett*, 58 F. (2d) 991, affirmed by the Supreme Court of the United States in 284 U. S. 584, 52 S. Ct. 127, 76 L. Ed. 506.

The effect of the enforcement of the ordinance is to place the ordinary retail groceryman on the same basis in the purchase and sale of his goods as that occupied by a retail store operated by a chain store organization. The goods sold by each retailer will bear the same amount of taxation, by reason of the taxes paid by the wholesaler or distributor from whom the goods are obtained, the tax being reflected in the selling price of the goods. The ordinance prevents a retail chain store from underselling other ordinary merchants by reason of not being required to pay as much taxes as the ordinary merchant who secures his merchandise from a wholesaler paying a license tax as such. Otherwise,

in the end, independent retailers will have to bear the burden of two taxes, their retail license tax and a proportionate part of the wholesale license tax paid by the wholesaler from whom they purchased. However, if the retailer in either classification purchases directly and independently from wholesalers or distributors located outside of the City, who have no warehouses or place of business in the City, each classification stands upon the same footing.

Counsel for the Company contend with much earnestness that according to the dictionaries the words "distributed through" express the idea of physical entering, passage through and physical exit from, and cite numerous definitions to that effect. Like many words in the English language, the two words "distribute" and "through" have various meanings, meanings which are dependent upon the thought with which they are used and the context in which they are employed.

Among a number of definitions of the word "distribute" in Webster's New International Dictionary, Second Edition, Unabridged, we find the following: "To divide among several or many; to deal out; apportion, allot" and "To spread out so as to cover a surface or a space; as to *distribute* fertilizer; to *distribute* printing ink", and "to divide or separate", etc.

Among the definitions of the word "through", given by the same authority, are: "By means of; by the intermediacy of; in the name or as agent of; by the agency of; as, to speak *through* an interpreter; *procured through* a friend", and also "By reason of; in consequence of; because of; as, he did, through fear of arrest", together with six other definitions for specific uses.

We conclude from the intent and purpose of the ordinance and the connection in which the words were used that the word "distribute" means "to allot or apportion", and the word "through" means "by means of" or "by the agency of". In this connection the use of the words "or place" is significant. It negatives any intention to confine the assessment to goods physically passing through a warehouse.

A house is a "place" and an office is also a "place". The meaning of the word "place" has been frequently declared by the courts as meaning in its primary and general sense a locality, situation, site, and a portion of space regarded as distinct from all other space. *Burns* v. *McDaniel*, 104 Fla. 526, 140 So. 314, 316; *Prentiss* v. *Davis*, 83 Me. 364, 22 A. 246, 248; *Cox* v. *State*, 203 Ind. 544, 177 N. E. 898, 181 N. E. 469. The word "distributing" qualifies the word "place" as well as the word "house". The merchandise must have been distributed, allotted or apportioned among the retail stores through or by means of a "place", the Richmond office of the Company, or other "house" or "place".

The foregoing well known meanings of the words 'support the purpose for which the ordinance was enacted. With such meanings the statute becomes plain and unambiguous and general rules for the construction of statutes of doubtful meaning have no application. *South Hill* v. *Allen*, 177 Va. 154, 12 S. E. (2d) 770; *Watkins* v. *Hall*, 161 Va. 924, 172 S. E. 445; *Superior Steel Corp.* v. *Commonwealth*, 147 Va. 202, 136 S. E. 666.

The Company contends that its construction of the ordinance is the same as that which the taxing officials of the State placed upon the similar language of Section 188 of the Tax Code of Virginia in the hearing of *Commonwealth* v. *Bibee Gro. Co.*, *supra*, and *Great Atlantic, etc., Tea Co.* v. *Morrissett*, *supra*. The *Bibee Case* was decided in January, 1930, and involved a distributor's license tax for the year 1928. The *Morrissett Case* was decided in April, 1931, and involved a similar license tax for 1930. In each of those cases the assessment was based on merchandise actually stored in and physically distributed from warehouses. The real attack in the two cases was upon the constitutionality of Section 188, on the ground that an assessment based on merchandise so situated was discriminatory, and that the classification for taxation was unreasonable within the purview of the State and Federal Constitutions. In each case the statute was upheld.

No question of construction of the State statute was involved in either of those cases. The question here involved did not arise, because the assessments there were based only upon the merchandise physically located in and removed from taxpayers warehouses. The city of Richmond was not a party to either case. It is not bound by any administrative interpretation of the statute by State officials. Its officers charged with the duty of assessing and collecting the license tax did not obtain knowledge of the company's method of distributing its merchandise to its retail stores until they audited the books of the Company in 1942. Prior to that time they accepted the amounts returned by the Company according to its interpretation of the ordinance. When the facts herein stated were ascertained, through the audit, the assessment here complained of was promptly made and applied for as many previous years as the law permitted. The officers of the City did not have full knowledge of all the facts until 1942.

Whatever may have been the views of the State taxing officials prior to the decisions in the cases of *McGoldrick* v. *Berwind-White Coal Min. Co., supra,* and *Dunston* v. *Norfolk,* 177 Va. 689, 15 S. E. (2d) 86, where the prior strict and narrow interpretation of the Commerce Clause of the Federal Constitution, as applied to taxation upon merchandise moving in interstate commerce, was modified and relaxed, it is in evidence here that immediately thereafter taxing agencies of the State were instructed to levy a license tax against wholesale merchants based on the cost of merchandise shipped by or for them from points without 'the State to points within the State, from points within the State to points without the State, and from points within the State to other points within the State, although such merchandise did not physically pass through the places of business of those merchants.

The mere fact that State or city officials may have thought merchandise moving in interstate commerce could not be lawfully included in a return to be used as a basis for taxation prior to the decision cited does not preclude

the City from exercising such right when all the facts have been disclosed and brought to its attention.

A statute or ordinance in general and comprehensive terms and prospective in operation applies not only to situations existing at the time of its enactment, but to situations and subjects which may come into existence thereafter. Statutes and Statutory Construction, Sutherland, (3d ed.) Section 5102.

The ordinances of Richmond require its Commissioner of the Revenue to make assessment of license taxes against all persons, firms and corporations who shall have failed for any tax year or the three years prior to the discovery of the failure to make a proper return and pay the proper license tax for each of the three years. If the Commissioner fails to do his full duty, the taxpayer will be benefited to the extent of the limitation on the years for which he may be assessed. He cannot, however, escape taxation where the Commissioner did not know of the existence of the taxable subject, or his duty to make the assessment, and no voluntary listing had been made by the taxpayer. *Firemen's Mut. Aid Ass'n v. Commonwealth*, 166 Va. 34, 184 S. E. 189.

The undisputed evidence discloses no discrimination in the enforcement of the city ordinance against the plaintiff in error. The officials of the city charged with the duty of assessing and collecting the license tax have assessed the competitors of the company and all wholesale merchants of the city with similar assessments on the cost value of merchandise that did not physically reach and pass through their places of business.

The Company further contends that the City of Richmond cannot impose a tax upon so much of the merchandise as never came within the territorial limits of the City, but reached its retail stores outside of the City from points without the City. It cites in support *Robinson v. Norfolk*, 108 Va. 14, 60 S. E. 762.

The vice in this contention is that the ordinance does not impose a direct tax upon any property of the

Company. It imposes a privilege tax, that is, a license tax for the privilege of maintaining and conducting a place of business in the City for the distribution of merchandise among retail stores. The property of the Company is not directly taxed as such. The merchandise which it distributes through the agency of its office or place of business in the city of Richmond is merely made the measure of the amount to be paid for the privilege of conducting the business involved. See *Pelouze* v. *Richmond, ante,* p. 805, 33 S. E. (2d) 767.

The trial court's distinction between the items upon which the total assessment was based is logical and sound, its construction of the ordinance is in accord with the language used therein and with the reason and intendment of its enactment, and its application of the law is without error. Its judgment is, therefore, affirmed.

*Affirmed.*

CAMPBELL, C. J., and BROWNING, J., dissenting.