[Crim. No. 10999. In Bank. Oct. 2, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GENE DAN-
IELS and ARCHIE SIMMONS, Defendants and Appel-
lants.

Bernard G. Winsberg and Herbert E. Selwyn, under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—By amended indictment defendant Simmons was charged in count I with raping Miss M. by means of force and threat (Pen. Code, § 261, subds. 3 and 4); in count II defendants Daniels and Simmons were charged with kidnaping Mrs. R. for the purpose of robbery, the victim suffering bodily harm (Pen. Code, § 209); in count III Simmons was charged with kidnaping Miss S. for the purpose of robbery, the victim suffering bodily harm (Pen. Code, § 209); and in count IV Daniels and Simmons were charged with kidnaping Miss K. for the purpose of robbery, the victim suffering bodily harm (Pen. Code, § 209). Daniels was charged with a prior conviction of simple kidnaping (Pen. Code, § 207) and rape (Pen. Code, § 261, subd. 3).

Defendants entered pleas of not guilty, and Daniels admitted the prior conviction. The jury found defendants guilty on all counts. The allegations in counts II, III, and IV that the kidnaping victims suffered bodily harm were found true.[1]

The jury fixed the penalty at death on the kidnaping counts. Motions for new trial were denied. On count I Simmons was sentenced to prison for the term prescribed by law, and on the remaining counts he was sentenced to death; on counts II and IV Daniels was sentenced to death. The appeals from the judgments of death are automatic. (Pen. Code, § 1239, subd. (b).)

The relevant facts, viewed most favorably to the People, may be summarized as follows:

*Count I.* Miss M., a 24-year-old school teacher and graduate student, returned to her apartment shortly after midnight on

---

[1] The jury found, as also alleged, that defendants were armed with a deadly weapon, to-wit, a revolver, at the time of committing each of the crimes charged in counts II, III, and IV, except that as to defendant Daniels the charge of being thus armed in count IV was found not true.

January 17, 1966. Finding no nearby parking space, she drove to her garage in an alley behind the apartment building. In so doing she observed two men standing on the street corner. As she was getting out of her car in the garage, she looked to the rear and saw defendant Simmons. She screamed, and he rushed towards her and struck her in the face, dislocating her jaw. He said, ''Shut up; I have a knife,'' and held the weapon at her throat. Badly frightened, she asked him what he wanted. He ordered her into the back seat of the car, where he overcame her vigorous resistance and accomplished an act of rape. He then asked her if she had any money, and she told him to look in her purse.[2]

After Simmons left her, Miss M. crawled into the front seat and began to drive in the direction of a hospital. In her hysteria she had forgotten to turn on the car's headlights, and she was soon stopped by police for driving without lights and failing to observe a red signal. She ran towards the police car, screaming for help and for a doctor. Her face was swollen, her hair and clothing were in disarray, and she had lost her shoes. The officer obtained a description of the assailant, then took her to the hospital for treatment.

*Count II*. Two nights later, Mrs. R. was in her home awaiting the return of her husband, a deputy sheriff. There was a knock at the door, and she opened it. Defendants Daniels and Simmons, the latter carrying a gun, forced their way in. They pointed the weapon at her face and asked if she had any money, but she replied she did not. They walked her quickly through the dining room into the kitchen, a distance of approximately 18 feet. They repeated their demand for money, and she told them to look in her purse and see for themselves.[3]

Daniels, who was then holding the gun, put a dish towel over Mrs. R.'s face and warned her not to scream or he would shoot her. Simmons removed her pants and raped her. During the act of intercourse Daniels left the room briefly, then returned and told Simmons they had better get out of there. Again warning her not to move or cry out, defendants left the house. In a distraught condition Mrs. R. telephoned for her husband, and when he arrived the police were called and furnished with a description of the attackers.

*Count III*. Miss S., a graduate student, lived alone in a one-room apartment with a small kitchen and bathroom. Shortly after 11 p.m. on May 19, 1966, there was a knock at the door.

---

[2]As it turned out, she had no money with her at the time.

[3]Defendants apparently found no money, for nothing was taken.

As she was expecting a classmate, she opened the door and was confronted by defendant Simmons. He asked for someone by a certain name; she said no one by that name lived there, and requested him to leave. She tried to shut the door, but he forced his way in, pushed her against the wall, and pulled a gun out of a paper bag he was carrying. When she screamed for her next-door neighbor, Simmons put the gun to the back of her neck and said he would shoot her if anyone came. He then demanded her money. She walked over to a nearby table on which her purse was lying, a distance of five or six feet; he followed with the gun, and she gave him the $12 that the purse contained.

Simmons then directed her to turn off the lights, lie down on the couch, and remove her clothes. After forcing her to orally copulate him, he raped her but achieved only slight penetration. Hoping to distract him from hurting her further, Miss S. engaged him in conversation. The lights were turned on again, and she could see him clearly. After a while he took her into the adjoining bathroom and resumed the sexual assault, forcing her to orally copulate him once more and to submit to another act of rape. Returning to the living room, Simmons emptied out her purse and examined its contents. He threatened to rip out the telephone cord unless Miss S. promised not to call anyone. Finally he replaced his gun in the paper bag and left the apartment. Miss S. immediately called the police, gave them a description of Simmons, and was taken to hospital for treatment.

*Count IV* Miss K., a student and part-time employee, was alone in her small cottage-apartment on the evening of May 31, 1966. She answered her doorbell about 9:45 p.m. and was met by defendants Daniels and Simmons. Simmons asked if the manager was in; Miss K. said this was not the manager's apartment and offered to give them the latter's telephone number. They seemed to look around, then Simmons pulled a gun from something he was carrying, pushed the door fully open, and forced Miss K. to step back into the room. Simmons asked if she was alone, and she said she was. He turned her around, put one hand over her mouth, held the gun to the back of her head, and walked her first towards the kitchen and then towards the bedroom to see if anyone was there. He then sat her down on the bed and asked for her money. The distance that the parties had covered was about 30 feet.

Miss K. told defendants her purse was on the couch in the living room, and Daniels went to look for it. Simmons put a bathrobe over her head, but she could hear her purse being

shaken. They asked if there was any more money, and searched some dresser drawers. They then removed her stockings and pants, and each raped her in turn. After taking off the rest of her clothing, defendants debated whether to tie her up. Finally they left the apartment, warning her not to move. After they had gone Miss K. discovered that a few dollars and some coins were missing.

Each of the foregoing crimes took place in the vicinity of the University of Southern California campus. Several teams of police officers were assigned to the case and provided with detailed descriptions of the suspects' physical appearance and modus operandi. On the evening of June 2, 1966, i.e., two nights after the rape and robbery of Miss K., officers on patrol in the area observed two men, walking along the street, who fitted the description of the suspects. The men, defendants Daniels and Simmons, increased their pace when a second police car passed them. The officers stopped them on a well-lighted street corner and undertook a "pat down" search. Simmons was carrying, in his right hand, a paper bag which was found to contain a loaded revolver. Defendants were thereupon placed under arrest. The gun was subsequently identified by Mrs. R., Miss S., and Miss K., as resembling the weapon displayed when they were attacked. Simmons' fingerprints, moreover, were found in Miss S.'s bathroom on a bottle of lotion used by him before he raped her for the second time. Each of the victims identified her assailant or assailants in open court.

The defendants presented alibi defenses as to certain, but not all, of the crimes charged.

Penal Code section 209 provides in relevant part that "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, or *any person who kidnaps or carries away any individual to commit robbery,* or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of

parole in cases where such person or persons do not suffer bodily harm.'' (Italics added.)

The evolution of the language and construction of this statute since its enactment at the turn of the century has been explored at length in our prior decisions (see, e.g., *People* v. *Tanner* (1935) 3 Cal.2d 279 [44 P.2d 324]; *People* v. *Knowles* (1950) 35 Cal.2d 175 [217 P.2d 1]; *People* v. *Chessman* (1951) 38 Cal.2d 166 [238 P.2d 1001]; and *People* v. *Wein* (1958) 50 Cal.2d 383 [326 P.2d 457]), and the analysis need not be repeated here. For present purposes, it is sufficient to observe that by reason of the most recent amendment of section 209 (Stats. 1951, ch. 1749, p. 4167) the statute now makes punishable every person, inter alios, ''who kidnaps or carries away any individual to commit robbery. . . .'' Penal Code section 207, in turn, defines ''kidnapping'' as the act of one who ''forcibly steals, takes, or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county. . . .''

We meet at the outset the issue whether the acts of defendants Daniels and Simmons, on the record in this case, constitute the kind of conduct proscribed by section 209. In *People* v. *Chessman* (1951) *supra,* 38 Cal.2d 166, 192, the court construed the phrase, ''kidnaps or carries away,'' to mean the act of forcibly moving the victim any distance whatever, no matter how short or for what purpose, declaring that ''It is the fact, not the distance, of forcible removal which constitutes kidnaping in this state.'' In *People* v. *Wein* (1958) *supra,* 50 Cal.2d 383, the court applied the *Chessman* construction to characterize as ''kidnapping'' under section 209 the conduct of a defendant who, in the course of robbing and raping several women within the confines of their homes, forced each to move either from one room to another or across a single room, for distances varying from more than 50 feet to as little as 4 or 5 feet. The case at bar is the first to reach us on facts essentially identical to *Wein*: defendants here, in the course of robbing and raping three women in their own homes, forced them to move about their rooms for distances of 18 feet, 5 or 6 feet, and 30 feet respectively. Under the rule of *Chessman* and *Wein,* such brief movements of the victims would constitute ''kidnaping or carrying away'' within the meaning of the statute and would therefore be sufficient to support defendants' convictions of violating section 209.

We believe, however, the time has come to reconsider the construction placed upon the statute in *Chessman* and applied in *Wein.* More than a decade has elapsed since the latter

decision, and almost two decades since the former. During this period the law of kidnaping has not remained stagnant. There have been, as we will demonstrate, fresh judicial approaches, far-reaching legislative innovations, and considerable analysis of the problem by legal commentators and scholars. Out of this ferment has arisen a current of common sense in the construction and application of statutes defining the crime of kidnaping. *Chessman* and *Wein*, it now appears, stand as obstructions to the flow of that current in California.

We are not foreclosed from undertaking such an inquiry at this time by the statment in *Wein* (at p. 400 of 50 Cal.2d) that "the Legislature has been in session several times since the Chessman case was decided, and it has not seen fit to amend the kidnaping law to limit the rule we announced. If the section, *as interpreted by this court,* is regarded as too harsh, the remedy is for the Legislature to redefine kidnaping, and not for this court to engraft some uncertain distance limitation onto the plain language of the section." (Italics added.) ▮ Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval, the weaknesses of which have been exposed elsewhere.[4] But something more than mere silence

---

[4]"'The doctrine that legislative silence constitutes approval of judicial construction 'must be derived by a form of negative inference, a process lending itself to much guesswork. . . . There are vast differences between legislating by doing nothing and legislating by positive enactment, both in the processes by which the will of Congress is derived and stated and in the clarity and certainty of the expression of its will. And there are many reasons, other than to indicate approval of what the courts have done, why Congress may fail to take affirmative action to repudiate their misconstruction of its duly adopted laws. Among them may be sheer pressure of other and more important business. [Citation.] At times political considerations may work to forbid taking corrective action. And in such cases, as well as others, there may be a strong and proper tendency to trust to the courts to correct their own errors [citation], as they ought to do when experience has confirmed or demonstrated the errors' existence. . . . More often than not the only safe assumption to make from Congress' inaction is simply that Congress did not intend to act at all. [Citation.] At best the contrary view can only be an inference, altogether lacking in the normal evidence of legislative intent and often subject to varying views of that intent. In short, although recognizing that by silence Congress at times may be taken to acquiesce and thus approve, we should be very sure that, under all the circumstances of a given situation, it has done so before we rule and thus at once relieve ourselves from and shift to it the burden of correcting what we have done wrongly. . . . Just as dubious legislative history is at times much overridden, so also is silence or inaction often mistaken for legislation.' (Mr. Justice Rutledge, concurring in *Cleveland* v. *United States*, 329 U.S. 14, 23-24 [91 L.Ed. 12, 19-20, 67 S.Ct. 13].)'' (*People* v. *Hallner* (1954) 43 Cal.2d 715, 724-725 [277 P.2d 393] (dissenting opinion of Traynor, J.).)

should be required before that acquiescence is elevated into a species of implied legislation such as to bar the court from reexamining its own premises. "We are not here faced with a situation in which the Legislature has adopted an established judicial interpretation by repeated *reenactment* of a statute." (Italics added.) (*Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal. 2d 211, 218 [11 Cal. Rptr. 89, 359 P.2d 457] ; see, e.g., *People* v. *Curtis* (1969) 70 Cal.2d 347, 355.) [74 Cal. Rptr. 713, 450 P.2d 33].) The Legislature has neither reenacted nor amended nor rewritten any portion of sections 207 or 209 since the 1951 legislation construed in *Chessman.* The lawmakers, in short, have simply not spoken on the subject during the intervening years.

█ But while the Legislature may thus choose to remain silent, we may not. It continues to be our duty to decide each case that comes before us; in so doing, we must apply every statute in the case according to our best understanding of the legislative intent; and in the absence of further guidance by the Legislature, we should not hesitate to reconsider our prior construction of that intent whenever such a course is dictated by the teachings of time and experience. As the above-quoted language of *Wein* indicates, the rule of deference to legislative judgment applies to the statute "as interpreted by this court." █ It is this judicial interpretation, and not the wisdom of the statute itself, that is here in issue; and if we conclude we should now revise that interpretation, we have both the power and the duty to do so. (See, e.g., *People* v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], *People* v. *Pierce* (1964) 61 Cal.2d 879 [40 Cal. Rptr. 845, 395 P.2d 893] ; *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) Respect for the role of the judiciary in our tripartite system of government demands no less.

Turning to the merits, we first observe that the *Wein* court was essentially concerned with the practical problems which it feared would arise in any attempt to "engraft some uncertain distance limitation" onto the language of section 209. That concern, however, no longer appears so pressing. It is true that an effort to define the phrase, "another part of the same county," in terms of a specific number of inches or feet or miles would be open to a charge of arbitrariness. But it does not follow, conversely, that a definition other than in such terms would necessarily be "uncertain" in any legally objectionable sense of the word. The law is replete with instances in which a person must, at his peril, govern his conduct

by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the "reasonable or prudent" speed to drive his car in the circumstances (Veh. Code, § 22350), while another may be incarcerated in state prison on a conviction of wilful homicide if he misjudges the "reasonable" amount of force he may use in repelling an assault (*People* v. *Jones* (1961) 191 Cal.App.2d 478 [12 Cal.Rptr. 777]). As the Supreme Court said in *Go-Bart Importing Co.* v. *United States* (1931) 282 U.S. 344, 357 [75 L.Ed.2d 374, 382, 515 S.Ct. 153], "There is no formula for the determination of reasonableness." Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.

In *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459 [15 Cal. Rptr. 65, 364 P.2d 241], three years after *Wein* and 10 years after *Chessman,* we adopted such a standard for applying the kidnaping statute in California. There, a farm workers' camp had been picketed for some time by members of a labor union seeking to induce nonunion braceros to join a strike. After failing to persuade the braceros to come out of the camp voluntarily, the strikers forced their way in and resorted to violence. One bracero was chased into the barracks, then ordered out by strikers variously armed with a knife, sticks and stones. A second bracero was pushed by the strikers towards the front gate of the camp. A third was seized by the shirt, pulled out of a washroom, struck on the head, dragged some 15 feet, then thrown to the ground. An indictment was returned charging the strikers, inter alia, with three counts of kidnaping in violation of Penal Code section 207, predicated on their conduct in forcibly moving the three braceros from one part of the camp to another.

The case came to us on the defendants' petition for writ of prohibition. The record before the grand jury established that the defendants had forced each bracero to move *some* distance against his will. In such circumstances, we could simply have invoked the *Chessman-Wein* apothegm that "It is the fact, not the distance, of forcible removal" which constitutes kidnaping in this state. That would have both begun and ended the analysis, and the defendants would have been required to stand trial for "kidnaping" as that crime had theretofore been defined in our decisions.

But we did not do so. Rather, we issued a writ prohibiting the trial court from taking any further proceedings on the kidnaping counts other than to order their dismissal. Our reasoning was clear and forthright: "In the instant case, the only movements that occurred were those *natural in* a riot or assault. The evidence reveals that persons were pushed to the ground, dragged around, chased, and assaulted. All 'asportation' in the instant case would appear to be only *incidental to* the assault and rioting." (Italics added.) (56 Cal.2d at p. 464.)

In reaching this conclusion we invoked the settled rule of statutory interpretation that "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." (*United States* v. *Kirby* (1868) 74 U.S. (7 Wall.) 482, 486-487 [19 L.Ed.2d 278, 279]; accord, *People* v. *Oliver* (1961) 55 Cal.2d 761, 767 [12 Cal.Rptr. 865, 361 P.2d 593], and cases cited.) Turning to the kidnaping statute, we explained that "To us, it does not seem reasonable that the California Legislature, in enacting Penal Code section 207, intended the statute to apply to a case of assault or riot such as occurred in the case now engaging our attention. Such a holding could result in a rule that every assault could also be prosecuted for kidnapping under Penal Code section 207, as long as the slightest movement was involved." 56 Cal.2d at p. 465.) Accordingly, we held that "Where the movement is *incidental to* the alleged assault, Penal Code section 207 should not have application, as the Legislature could not reasonably have intended that such *incidental* movement be a taking '. . . from one part of the county to another.' " (Italics added.)

This reasoning applies equally and perhaps more significantly to the case before us. In *Cotton* the defendants' primary intent was not to commit bodily harm upon their victims but to force them to move from one specific place to another, i.e., to "come out of the camp" (56 Cal.2d at p. 461) so as to join the strike. As one of the braceros testified, "All of them [i.e., the strikers] were hollering for us to get out of the camp." (*Id.* at p. 463.) In the present case, by contrast, defendants had no interest in forcing their victims to move just for the sake of moving; their intent was to commit robberies and rapes, and the brief movements which they

compelled their victims to perform were solely to facilitate such crimes. It follows, a fortiori, that those movements were "incidental to" the robberies and rapes within the meaning of *Cotton*, and that "the Legislature could not reasonably have intended that such incidental movement be a taking '. . . from one part of the county to another.' "[5]

We are not unmindful of the fact that *Cotton* was a case of "simple" kidnaping under section 207, while we deal here with "aggravated" kidnaping under section 209. For the purpose at hand, however, this is a distinction without a difference. Since 1872 the code has defined "kidnaping" only in section 207, and since 1905 that definition has read as quoted earlier in this opinion. Section 208 declares the basic punishment for the crime of kidnaping (imprisonment for 1 to 25 years), and section 209 prescribes increased punishment when the kidnaping is for the purpose of ransom or robbery. In 1933, "The verb 'kidnaps' was included in the definition of the crime defined by section 209. It cannot be assumed the Legislature meant to define the section 209 crime by itself by using this word. The word must be construed to have a meaning apart from and narrower than the crime defined by section 209. There are two possibilities: (1) It meant common law kidnaping; or (2) it meant kidnaping as defined in section 207. Since the Legislature had already rejected the common-law definition of kidnaping and redefined it, the clear implication is that the word 'kidnaps' in section 209 means kidnaping as defined in section 207. This is the contention of the attorney general in his brief in this case." (*People* v. *Wein* (1958) *supra*, 50 Cal.2d 383, 415 (dissenting opinion of Carter, J.).) Indeed, although *Chessman* was a prosecution for aggravated kidnaping, five of the seven cases there relied on for the proposition that "fact not distance" constitutes the crime (38 Cal.2d at p. 192) were themselves, as was *Cotton*, prosecutions for simple kidnaping.[6]

---

[5]We do not imply that the *facts* of *Cotton* are controlling, i.e., that movements of the scope and nature of those in *Cotton* could not support a conviction under section 209 if the defendant's intent was to commit robbery. Such a case, when and if it arises, must be decided on its own facts. All we say here is that movements of the scope and nature of those in the case before us—and, by the same token, in *Wein*—fall within the *language* of *Cotton* which excludes from the definition of kidnaping movements "incidental to" the underlying crime.

[6]*People* v. *Oganesoff* (1947) 81 Cal.App.2d 709 [184 P.2d 953]; *People* v. *Shields* (1945) 70 Cal.App.2d 628 [161 P.2d 475]; *People* v. *Cook* (1937) 18 Cal.App.2d 625 [64 P.2d 449]; *State* v. *Taylor* (1940) 70 N.D. 201 [293 N.W. 219]; *Cox* v. *State* (1931) 203 Ind. 544 [177 N.E. 898, 181 N.E. 469].

The legal commentators quickly recognized the relevance of *Cotton* to the *Chessman-Wein* line of decisions. It was noted, for example, that the "broad language" used in the earlier cases to describe the element of asportation was "severely limited" by *Cotton*. (Enright, *California's Aggravated Kidnaping Statute—A Need for Revision* (1967) 4 San Diego L.Rev. 285, 293.) Another writer characterized *Cotton* as "in direct opposition" to the prior kidnaping cases. (Note, *Kidnaping and the Element of Asportation* (1962) 35 So.Cal.L.Rev. 212.) Still another observed that in *Cotton* "the California court seems to have rejected the thrust of its earlier kidnapping decisions." (Note, 110 U.Pa.L.Rev. (1961) 293, 295.) Pointing to the "compelling factual similarity" between *Cotton* and *Wein,* the author reasoned that "It would be difficult to distinguish them on the ground that the slight asportation involved in both was, in the language of the court in [*Cotton*], more 'natural in' or more 'incidental to' rioting and assault than to a rape accomplished within the confines of a single enclosure. The court recognized that mere movement of the victim of a crime should not inevitably lead to the criminal's being indicted for kidnapping, for movement is incidental to the commission of many crimes." (*Ibid.*) Finally, the view was voiced that while it would be salutary for the Legislature to codify the gloss placed upon the kidnaping statute by *Cotton,* "perhaps it is more realistic and appropriate to urge the courts, which originally eviscerated the statute, to apply the rationale of [*Cotton*] not only in all simple kidnapping cases but also in cases of aggravated kidnapping, where the problems of construing what constitutes asportation are highly analogous." (*Id.* at p. 297.)

A further analogy must be drawn to decisions of this court construing an equally essential element of section 209, i.e., whether the victim has suffered "bodily harm" within the meaning of the statute. Until 1955 the leading decision construing this language was *People* v. *Tanner* (1934) *supra,* 3 Cal.2d 279, 297. The court there said: "It will be noted that the statute does not use the words actual bodily harm, or great bodily harm, or bodily injury. Bodily, used singly, is defined as pertaining to the body. It is opposed to mental 'as bodily labor or pain; physical is often synonymous with bodily, as physical discomfort, suffering.' Harm is defined as 'hurt; injury; damage; (2) grief, pain, sorrow; (3) evil; wrong; wickedness.' (Webster's International Dictionary, 2d ed.) *Bodily harm* is generally defined as 'any touching of the person of another against his will with physical force in an in-

tentional, hostile and aggravated manner, or projecting of such force against his person.' ''

Applying this broad definition — taken essentially from the tort law of battery — the *Tanner* court held that a kidnaping victim who was locked in a closet and then bound hand and foot had suffered "bodily harm" within the meaning of section 209. The *Tanner* definition was quoted with approval in every aggravated kidnaping decision thereafter rendered by this court. (*People* v. *Britton* (1936) 6 Cal.2d 1, 3 [56 P.2d 494]; *People* v. *Brown* (1947) 29 Cal.2d 555, 559-560 [176 P.2d 929]; *People* v. *Chessman* (1951) *supra*, 38 Cal.2d 166, 185.)

In *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898], however, we reconsidered the matter. There, the kidnaping victim was pushed into a sitting position on a couch and was bound hand and foot with chains. The factual similarity to *Tanner* was striking. Under the *Tanner* construction of section 209 such mistreatment was sufficient to constitute "bodily harm," and the more severe penalties were accordingly imposed.

On appeal in *Jackson,* we reversed with directions to resentence the defendants for the crime of kidnaping for ransom but without bodily harm. In language foreshadowing our *Cotton* opinion, we said: "Tested in its application to the facts of the present case, it is seriously questionable whether the definition in the *Tanner* case states the intention of the Legislature in distinguishing between kidnaping with bodily harm and cases in which no injury to the victim has resulted. If the more serious penalty may be imposed when the only injury is of a nature similar to that shown by the present record, *which concededly is almost necessarily an incident to every forcible kidnaping,* neither the purpose of enhancement of the penalty for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring his victim is subserved." (Italics added.) (*Id.* at p. 517.) We concluded that the evidence "shows such trivial injury as to compel, as a matter of law, the conclusion that it is not of the nature contemplated by the Legislature in providing the more serious penalty for a kidnaping." (*Ibid.*) We have since reaffirmed the *Jackson* rule (*People* v. *Gilbert* (1965) 63 Cal.2d 690, 711 [47 Cal.Rptr. 909, 408 P.2d 365].), and it has been incorporated into a standard jury instruction.[7]

---

[7]CALJIC No. 655 states in relevant part: " 'Bodily harm,' as that term is used in this instruction, means *substantial* bodily injury or dam-

Here, as in *Jackson*, we are called upon to construe an essential term of the kidnaping statutes. In *Jackson* we did not deem ourselves barred from doing so because a prior construction of the statute by this court had been left undisturbed by the Legislature for some two decades, nor should such legislative silence immobilize us in the present case. Just as we recognized in *Jackson* that some minor injuries are necessarily incidental to the crime of forcible kidnaping, so we now recognize that some brief movements are necessarily incidental to the crime of armed robbery. Indeed, "It is difficult to conceive a situation in which the victim of a robbery does not make some movement under the duress occasioned by force or fear." (Enright, *op. cit. supra*, 4 San Diego L.Rev. 285.) And just as we concluded in *Jackson* that such incidental injuries are "not of the nature contemplated by the Legislature" in prescribing the bodily harm element of aggravated kidnaping, so we now conclude that such incidental movements are not of the scope intended by the Legislature in prescribing the asportation element of the same crime.[8]

Persuasive authority for our holding is found in a recent series of decisions by the New York Court of Appeals. While the precise wording of the kidnaping statute there construed is not the same as ours, the court's reasoning on the question of asportation is nevertheless applicable to the issue before us.

Until 1965, New York followed the rule that virtually any confinement or movement of the victim constituted kidnaping, even when it was undertaken solely to facilitate commission of another crime. A typical example was *People* v. *Florio* (1950) 301 N.Y. 46 [92 N.E.2d 881, 17 A.L.R.2d 993], in which the defendants, pursuant to a prearranged plan to

---

age to the body of a person who is the victim of such kidnaping by the application of physical force *above and in addition to the force which is necessarily involved* in the commission of such kidnaping." (Italics added.) The instruction has been judicially approved. (*People* v. *Reed* (1969) 270 Cal.App.2d 37, 49 [75 Cal.Rptr. 430].)

[8]Discussing the *Chessman* proposition that "fact not distance" constitutes kidnaping, the just-quoted author reasons that "If the statements in *Chessman* are carried to a more or less typical robbery situation, it is discernible that this was not the legislature's intent. Hypothetically, A enters a liquor store and orders the clerk, who is stocking the shelves, to go to the cash register and hand over the money. The clerk moves ten feet to the cash register and turns over the money to A. Applying *Chessman*, A may have violated section 209. It is doubtful that the legislature intended that this standard robbery situation should lead to a prosecution for kidnapping, or that the prosecutor should have an unlimited option to charge either robbery or kidnapping-for-robbery, or both, or mere false imprisonment." (Enright, *op. cit. supra*, 4 San Diego L.Rev. 285, 296.)

satisfy their sexual desires, lured a young woman into their automobile and drove from Manhattan to an isolated place in Queens, where they raped her. The defendants were convicted of kidnaping as well as assault and rape, and the New York Court of Appeals affirmed. While conceding that "the detention inevitably occurring during the immediate act of commission of such a crime as rape or robbery would not form a basis for a separate crime of kidnapping," the court held that such a separate crime had been committed in the circumstances of that case. (*Id.* at p. 882.) In so doing, the court relied on two earlier New York cases in which the victim had been confined in an automobile "for a short time" and for "less than two minutes." (*Id.* at pp. 882-883.)

In the landmark decision of *People* v. *Levy* (1965) 15 N.Y. 2d 159 [256 N.Y.S.2d 793, 204 N.E.2d 842], however, the Court of Appeals rejected its earlier construction of the kidnaping law. There the defendants accosted a husband and wife as they pulled up in front of their house and forced them at gunpoint back into their car; one defendant drove the vehicle aimlessly for 27 blocks, consuming 20 minutes of time, while the other robbed the victims of their jewelry and wallet. The defendants were convicted of kidnaping as well as first degree robbery and possession of a pistol. The Court of Appeals reversed the judgments on the kidnaping counts and directed dismissal of those counts as a matter of law.

The court recognized that "Kidnapping is, by contemporary statutory standards, one of the most serious of crimes. In our era this crime has assumed particularly reprehensible forms." (204 N.E.2d at p. 843.) But the court then turned to fundamentals, observing that "In basic concept the crime of kidnapping envisages the asportation of a person under restraint and compulsion. Usually the complete control of the person and the secrecy of his location are means of facilitating extortion." (*Id.* at pp. 843-844.) Noting the breadth of the statutory definition of kidnaping, the court reasoned that it "could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes. Some of the definitions could apply alike to kidnapping and abduction. *It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left in another room or place.*

"It is unlikely that these restraints, sometimes accompanied by asportation, *which are incidents to other crimes* and have long been treated as integral parts of other crimes, were intended by the Legislature in framing its broad definition of kidnapping to constitute a separate crime of kidnapping, even though kidnapping might sometimes be spelled out literally from the statutory words." (Italics added.) (*Id.* at p. 844.)

The court then overruled *Florio,* and expressly "limit[ed] the application of the kidnapping statute to 'kidnapping' in the conventional sense in which that term has now come to have acquired meaning." (*Ibid.*)

Although recognizing there may be situations in which "actual kidnapping in this sense" can be established even though the detention or movement is undertaken to facilitate commission of another crime,[9] the court explained that "In the case before us the movement of the automobile, which was itself the situs of the robbery, was not essentially different in relation to the robbery than would be the tying up of a victim in a bank and *his movement into another room.* In essence the crime remained a robbery although some of the kidnapping statutory language might literally also apply to it." (Italics added.)

Finally, the court noted the unanimous support of its position expressed by the legal commentators and scholars: "This separation of essentially separate crimes is consistent with the general trend of professional comment and analysis of kidnapping statutes which would be read to include acts which are integral to other crimes and are not essentially kidnapping. (See, e.g., *A Rationale of the Law of Kidnapping,* 53 Col.L. Rev. 540, n. 20; *Judicial Construction of Kidnapping Statutes,* 15 Albany L.Rev. 65; *Room-to-Room Movement: A Risk Rationale for Aggravated Kidnaping,* 11 Stan.L.Rev. 554; *Kidnaping and the Element of Asportation,* Note 35 So.Calif. L.Rev. 212; Note 110 U.Pa.L.Rev. 293.)" (*Id.* at p. 845.)

The case before us involves movement of the victims with the intent to commit both robbery and rape. *Levy* was a kid-

---

[9]The opinion cites as an illustration *People* v. *Black* (1962) 18 App. Div.2d 719 [236 N.Y.S.2d 240], in which one of the victims of a robbery was transported as a hostage to another state and held for some time after the robbery was completed. A more recent example is *People* v. *Miles* (1969) 23 N.Y.2d 527 [297 N.Y.S.2d 913, 245 N.E.2d 688], in which the New York Court of Appeals declined to apply the *Levy* rule to defendants who attempted to murder their victim in New Jersey, tied him up and threw him into the trunk of an automobile, drove for several hours in various directions looking for a place to finish killing him and dispose of his body, and finally crossed the state line into New York, where the arrest took place.

nap-robbery case; two years later a kidnap-rape case similar to *Florio* arose in *People* v. *Lombardi* (1967) 20 N.Y.2d 266 [282 N.Y.S.2d 519, 229 N.E.2d 206], and the New York Court of Appeals did not hesitate to apply the *Levy* rule again. The defendant in *Lombardi,* a pharmacist, tricked three young women into taking barbiturates which impaired their will and ability to resist, then drove them from Manhattan to a hotel in Queens, where he sexually assaulted them. On these facts he was convicted of kidnaping as well as assault and attempted rape.

The Court of Appeals recognized that "The asportation of the three young women from Manhattan to Queens, aided in part, at least, by the drug, and the physical domination of them in a motel made possible by the drug, comes literally within the terms of the kidnapping statute." (*Id.* at p. 208.) But the court observed (*ibid.*) that "the direction of the criminal law has been to limit the scope of the kidnapping statute, with its very substantially more severe penal consequences, to true kidnapping situations and not to apply it to crimes which are essentially robbery, rape or assault and in which some confinement or asportation *occurs as a subsidiary incident.*" (Italics added.) Stating that in the case before it asportation "played no significant role in the crimes," the court held *Levy* to be controlling and reversed with directions to dismiss the kidnaping counts.[10]

Finally, the spirit animating these judicial developments in the law of kidnaping has also manifested itself in new legislative proposals and enactments. Section 212.1 of the Model Penal Code, adopted by the American Law Institute in 1962, provides that "A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a *substantial* distance from the vicinity where he is found, or if he unlawfully confines another for a *susbtantial* period in a place of isolation," for the purpose, inter alia, of terror-

---

[10]Other New York decisions applying *Levy* are *People* v. *King* (1966) 26 App.Div.2d 832 [273 N.Y.S.2d 925] [kidnaping incident to rape and robbery], and *People* v. *Hatch* (1966) 25 App.Div.2d 606 [267 N.Y.S.2d 651] [kidnaping incident to rape]. The New York Court of Appeals has since undertaken to explain the *Levy-Lombardi* rule in *People* v. *Miles* (1969) *supra,* 245 N.E.2d 688, 694-695; much of the explanation is less than clear, but the court does conclude that the rule "was designed to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal." Courts of other jurisdictions have also warned prosecutors against abusing kidnaping statutes in this manner. (See, e.g., *State* v. *Morris* 1968) 281 Minn. 119 [160 N.W.2d 715, 718]; *State* v. *Johnson* (1961) 67 N.J. Super 414 [170 A.2d 830, 835].)

izing or holding the victim for ransom, or of facilitating the commission of a felony. (Italics added.)

The learned draftsmen of the Model Code explain that "it is desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice, as well as to distortion of criminal statistics. Examples of abusive prosecution for kidnapping are common. Among the worst is use of this means to secure a death sentence or life imprisonment for behavior that amounts in substance to robbery or rape, in a jurisdiction where these offenses are not subject to such penalties [citing *Tanner, Knowles, Chessman,* and *Wein*]. The criminologically nonsignificant circumstance that the victim was detained or moved *incident to* the crime determines whether the offender lives or dies." (Italics added.) (Comments to § 212.1 (Tent.Draft No. 11, 1960), pp. 13-14.)

Turning to their proposed formulation, the draftsmen point out (at p. 16) that it first defines kidnaping in terms of removing the victim from his customary place of abode or work: "This eliminates the absurdity of prosecuting for kidnapping in cases where the victim is forced into his own home to open the safe, or to the back of his store in the course of a robbery. For situations where the victim is seized elsewhere than in his residence or place of business, the section requires removal 'a substantial distance from the vicinity' of seizure. By using the word 'vicinity' rather than 'place' and by requiring substantial removal, the section makes clear the purpose to preclude kidnapping convictions based on trivial changes of location having no bearing on the evil at hand."[11]

The Model Penal Code definition of kidnaping was adopted in virtually identical terms by the draftsmen of the recent revision of the New York criminal code. (Proposed New York Penal Law (1964), § 140.15.)[12] The New York Legislature ultimately enacted a somewhat more complicated statutory scheme (N.Y. Pen. Law, art. 135 (eff. Sept. 1, 1967)), but

[11]The draftsmen note, however, that in California a similar purpose can be achieved by statutory construction. Pointing out that Penal Code section 207 defines kidnaping as forcible movement of the victim, inter alia, "into another part of the same county," the draftsmen conclude that "a court would be justified in reading into this phrase some requirement of substantial displacement" (*id.* at p. 12, n. 7).

[12]Writing a year before *Levy* was decided, these draftsmen condemned the preexisting New York statute as "inordinately broad, encompassing, for example, ordinary robberies and rapes in the course of which the victim happens to be moved a few feet from one room to another" (*id.* at pp. 344-345).

preserved the Model Code requirement that the asportation be "substantial."[13] Commenting on the new statute in *Lombardi,* the Court of Appeals explained (at p. 209 of 229 N.E. 2d) that "The Legislature has undertaken to bring more certainty than the court was able to achieve in *Levy* to the problem of when confinement and restraint are significant enough by themselves to warrant a kidnapping prosecution." Similar legislative undertakings to provide "more certainty" and detail than is ordinarily appropriate in an appellate opinion are not unknown in California. (Compare *Muskopf* v. *Corning Hospital Dist.* (1961) *supra,* 55 Cal.2d 211, with the 1963 soverign immunity legislation (Stats. 1963, ch. 1681).)

 For the reasons stated, the rule of constuction declared in *People* v. *Chessman* (1951) *supra,* 38 Cal.2d 166, 192, i.e., that "It is the fact, not the distance, of forcible removal which constitutes kidnaping in this state," is no longer to be followed. Rather, we hold that the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only "standstill" robberies (e.g., *People* v. *Knowles* (1950) *supra,* 35 Cal.2d 175) but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. (See Note, *Room-to-Room Movement: A Risk Rationale for Aggravated Kidnaping* (1959) 11 Stan.L.Rev. 554, 555; Note, *A Rationale of the Law of Kidnapping* (1953) Colum.L.Rev. 540, 554-557.) "This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." (*Holy Trinity Church* v. *United States* (1892) 143 U.S. 457, 459 [36 L.Ed. 226, 228, 125 S.Ct. 511].)

[13]Thus in New York a person is guilty of simple kidnaping when he "abducts" another person (§ 135.20); to "abduct" means to "restrain" by concealment or force (§ 135.00, subd. 2); and to "restrain" means to restrict a person's movements "in such manner as to interfere *substantially* with his liberty" (italics added; § 135.00, subd. 1). A person is guilty of aggravated kidnaping when he thus "abducts" another person and when (1) his intent is to demand ransom, or (2) he restrains the victim for more than 12 hours with intent to terrorize the victim or to facilitate the commission of a felony (§ 135.25).

■ Applying this rule to the facts at hand, we conclude that the brief movements which defendants Daniels and Simmons compelled their victims to perform in furtherance of robbery were merely incidental to that crime and did not substantially increase the risk of harm otherwise present. ■ Indeed, when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him — whether it be a residence, as here, or a place of business or other enclosure — his conduct generally will not be deemed to constitute the offense proscribed by section 209. Movement across a room or from one room to another, in short, cannot reasonably be found to be asportation "into another part of the same county." (Pen. Code, § 207.) ■ Accordingly, the judgments on counts II, III, and IV must be reversed, and *People* v. *Wein* (1958) *supra,* 50 Cal.2d 383, must be, and is, overruled insofar as it is inconsistent with the views herein expressed.[14]

In view of this disposition we do not reach the majority of defendants' remaining contentions, which deal with events not likely to recur upon retrial. ■ Defendant Simmons raises one point, however, which also relates to his conviction of rape on count I. He claims he was denied counsel of his own choosing, and points to various objections he voiced to the attorney appointed for him by the court. Yet when the whole record on this point is considered, it fails to support Simmons' position.

Initially the public defender was assigned to represent both defendants. On Friday, July 8, 1966, because of a conflict of interest, the public defender moved for the appointment of separate counsel for Simmons under Penal Code section 987a, and the court selected attorney Joseph Rosen for this purpose. After conferring with Simmons, Mr. Rosen informed the court that Simmons said his father was flying to Los Angeles that weekend with an attorney to represent him. Upon learning that counsel was expected to arrive from Milwaukee the court inquired if he was licensed to practice in California, and Simmons replied he "wouldn't know that." The court then advised Simmons that counsel could not appear unless he

---

[14]Because the relevant facts of *Wein* were identical to those of the case at bar, its application of section 209 falls with the reversal we order here. We do not, however, decide whether the rule we now enunciate would have required reversal of kidnaping convictions in cases presenting different facts, such as *Chessman* or any other matter now final. Our task is to decide the case before us, and, if necessary and appropriate, to provide guidelines for future application of the kidnaping statute.

was licensed in California and that the appointment of Mr. Rosen would stand. Nevertheless, the court continued the case until the following Monday in the event Simmons' father brought a qualified attorney.

When the case was called again, Simmons was asked if his father had arrived with an attorney, and he replied, "Not as I know of." After some discussion among the court and counsel relative to a trial date, Simmons said, "I would like the record to show I don't like this attorney forced on me by this Court." The court replied that Mr. Rosen was experienced in defending death penalty cases and had been selected because of his skill, reputation and knowledge. The court further advised him that if his father were to arrive with an attorney who was admitted to practice law in California and who agreed to act for him, Simmons might substitute counsel at that time. Simmons announced, however, that "until my people get an attorney, I would rather go pro. per. I don't want [Mr. Rosen] to represent me as an attorney."

The court thereupon undertook to determine whether Simmons was competent to conduct his own defense. The court inquired if Simmons knew what hearsay testimony was. Simmons replied that he did; but when asked if he knew any exceptions to the hearsay rule, Simmons declined to answer, saying it was not "appropriate." In response to the court's question whether he knew what a peremptory challenge was, he said, "I never heerd [sic] of it." The court expressed the opinion that Simmons was not competent to represent himself and that a miscarriage of justice might result if he were permitted to do so. The request to proceed in propria persona was therefore denied.

 We explained in *People* v. *Carter* (1967) 66 Cal.2d 666, 672 [58 Cal.Rptr. 614, 427 P.2d 214], that "although every defendant in a criminal case has the constitutional right to represent himself if he so elects [citations], before his waiver of counsel may be accepted the trial court is duty bound to determine his competency to represent himself. [Citations.] . . . This determination involves an exercise of discretion by the trial judge which, in the absence of a showing of abuse, will not be disturbed on appeal." A defendant's ignorance of important rules of procedure or evidence, for example, will support an order denying him permission to proceed in propria persona. (*People* v. *Kemp* (1961) 55 Cal.2d 458, 463 [11 Cal.Rptr. 361, 359 P.2d 913].)

Here the trial court showed Simmons every consideration in the matter of obtaining counsel. When the out-of-state attorney whom Simmons was assertedly expecting failed to appear, the court had no alternative but to confirm the appointment of Mr. Rosen. The case was ready for the setting of a trial date, and a defendant's right to counsel of his choice may not be abused for the purpose of delay. When Simmons thereupon claimed the right to proceed in propria persona, the court duly determined his lack of competency to do so. Simmons now complains that the court "did not make sufficient inquiry" into his legal capabilities before finding them inadequate. Admittedly the court's questions on the subject were brief; but the sufficiency of such an inquiry cannot be judged in a vacuum, without regard to the circumstances of the particular case. Here a defense against the pending charges was complicated by such factors as a second defendant with an apparent conflict of interest and a separate attorney, multiple counts involving highly technical elements, and the possibility of the death penalty. When Simmons' ignorance of rules of procedure and evidence was added to this picture, the trial court could reasonably conclude that a miscarriage of justice might well result if he attempted to conduct his own defense. We have previously voiced "our deep concern to protect the right to the assistance of counsel against hasty and improvident waiver." (*People* v. *Carter* (1967) *supra,* 66 Cal.2d 666, 673.) No abuse of the trial court's discretion is shown.

Because of its bearing on Simmons' conviction on count I, we reach Daniels' contention that the police lineups at which he and Simmons were identified by the victims were so unfairly conducted as to deny them due process of law. (*People* v. *Caruso* (1968) 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].)[15] Defendants were arrested on the night of June 2, 1966, and three lineups were conducted the next day. One of the lineups consisted of five men, including defendants; the others consisted of four men, including defendants. The participants in the lineups were of generally similar appearance to defendants, both in complexion and stature; the victims

---

[15]The lineups in question took place more than a year before *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], which declared a constitutional right to the assistance of counsel at that stage of the proceedings. We decline Daniels' invitation to overrule or qualify *People* v. *Feggans* (1967) 67 Cal.2d 444, 448-449 [62 Cal.Rptr. 419, 432 P.2d 21], holding those decisions to be prospective as a matter of state law. (See also *Stovall* v. *Denno* (1967) 388 U.S. 293, 296 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967].)

viewed the lineups separately, did not discuss the matter with each other, and were not influenced by the police in making their decisions. In these circumstances defendants were not "singularly marked for identification" within the meaning of *Caruso* (68 Cal.2d at p. 187), and the lineups were not "unnecessarily suggestive and conducive to irreparable mistaken identification" within the meaning of *Stovall* (388 U.S. at p. 302 [18 L.Ed.2d at p. 1206]). Accordingly, there was no denial of due process.[16]

The original indictment in this case, filed two weeks after defendants' arrest, also included counts charging Daniels and Simmons with rape, robbery, and burglary committed against Miss K. and with rape, attempted robbery, and burglary committed against Mrs. R., and charging Simmons with rape, robbery, burglary, and a violation of Penal Code section 288a committed against Miss S. For reasons which do not appear in the record, the prosecuting authorities decided not to go to trial on those counts and amended the indictment accordingly. For the guidance of the court on retrial, however, we observe that the three-year statute of limitations (Pen. Code, § 800) would not bar the prosecution of Daniels and Simmons on a second amended indictment charging the crimes listed above. Such an indictment would, for this purpose, be deemed to relate back to the date of the original indictment. (Cf. *In re McCartney* (1966) 64 Cal.2d 830 [51 Cal.Rptr. 894, 415 P.2d 782]; *In re Davis* (1936) 13 Cal.App.2d 109 [56 P.2d 302].) Although defendants may not be convicted on this record of violating Penal Code section 209, they may be prosecuted to the fullest extent of the law for the remaining crimes charged against them by the grand jury.

The judgment on count I is affirmed. The judgments on counts II, III, and IV are reversed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I would affirm the judgments in their entirety.

---

[16]We do not. adjudicate Daniels' contention that the court erred in admitting into evidence a small pocket-knife and a piece of nylon stocking found in his possession at the time of his arrest. It is appropriate to point out, however, that the question of admissibility appears to be a close one (see *People* v. *Riser* (1956) 47 Cal.2d 566, 577 [305 P.2d 1], and cases cited), and the district attorney would do well to reconsider, in the light of the limited probative value of this evidence, whether to offer it in any future proceedings.