Filed 12/9/13  P. v. Riley CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056633 |
| v. | (Super.Ct.No. FSB1100293) |
| DEWAYNE MAURICE RILEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Duke D. Rouse, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

Richard de la Sota, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan J. Beale, and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

# INTRODUCTION[1]

A jury convicted defendant Dewayne Maurice Riley of 12 offenses arising from the gang-related robbery of about $169 from a Jack in the Box restaurant, while accompanied by codefendant Calvin Ray Vance, a fellow gang member.[2] Defendant was the gunman. The court sentenced defendant to an aggregate prison term of 243 years (225 years to life plus 18 years).

On appeal defendant challenges the five convictions of aggravated kidnapping for robbery (§ 209, subd. (b)(1), counts 1 through 5). We reverse defendant's conviction on count 1 for aggravated kidnapping and order the trial court to impose the stayed sentence for robbery (§ 211) on count 6. Otherwise, we reject defendant's contentions and affirm the judgment.

# II

# STATEMENT OF FACTS

*A. The Jack in the Box Robbery*

About 9:00 p.m. on January 18, 2011, five employees were working at a Jack in the Box restaurant located in Colton, California: Javid Bholat, the manager; Monica Ramirez, the cashier; Guadalupe Moreno and Carlos Melendez, both cooks; and Ariadne Cedillo, the team leader.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Vance's appeal is the subject of a separate appeal, *People v. Vance*, E054460.

In addition to a kitchen area, the food restaurant has an interior manager's office, five by 13 feet, with two safes. The sink area is behind the office and the break room is behind the sink area. The sink area and the break room are at the back of the restaurant.

Bholat, Melendez and Cedillo were standing in the kitchen near the deep-fat fryer. Near the back of the restaurant, Moreno was washing dishes at the sinks and Ramirez was coming out of the break room. A hooded, masked man—wearing gloves and carrying a handgun—jumped over the front counter, demanded money, and herded all five employees into the manager's office in the center of the restaurant. All the employees were afraid and felt threatened.

Bholat, the manager, testified that the gunman singled him out and, pointing the gun, asked, "Where is the money?" Although there were two open cash registers at the counter and the drive-through window, Bholat told him there was cash in a safe in the office. At direction of the gunman, Bholat and the other employees went into the office.

After Bholat opened one safe and gave the robber the small amount of money ($17) inside, the robber demanded money from the other safe. Bholat explained that it was equipped with a 10-minute delay. When the robber objected to waiting, Bholat instructed Cedillo to get money from the cash register at the counter. Cedillo retrieved some cash and gave it to the robber who jumped the counter and ran out the north door of the restaurant.

While Bholat called 911, Cedillo watched the robber get in a black four-door vehicle positioned outside the north door. Defendant later identified the car as a

3

Chevrolet Caprice, owned by codefendant Vance's mother. The vehicle left the restaurant and proceeded at a high speed to the 215 freeway.

B. *The Apprehension of Defendant*

The black Caprice led two Colton police officers, Gary Gruenzner and Roberto Dimas, in a high speed chase on the freeway until the Caprice exited the freeway and collided with a truck before stopping. After the collision, the truck driver saw a person exit the black vehicle and take off running.

When Dimas arrived at the scene, he watched a Black male, identified as defendant, exit on the driver's side and start running. The front passenger door had been damaged and could only be opened by force. Dimas chased defendant and captured him in the backyard of a nearby house, where he was taken into custody after a brief struggle. The police found a black cotton glove near the scene. Defendant had a wad of cash[3] in his pocket, corresponding to the money that Cedillo had given the masked robber. Defendant wore a pair of Nike shoes, which matched the shoe print lifted from the dining room floor of the restaurant.

Vance was discovered hiding next to a hedge in a nearby church courtyard. The Caprice contained a hooded sweatshirt, various hats and gloves, and a loaded .38 special Rosse handgun, resembling the gun used in the robbery.

---

[3] Forty-four $1 bills, nineteen $5 bills, and three $10 bills.

*C. Gang Evidence*

A gang expert, San Bernardino Police Officer Raymond Bonshire, testified that defendant and Vance are both active members of the Projects criminal street gang. Defendant and Vance both had multiple gang tattoos, indicating long-time gang membership. The gang territory is west of the 215 freeway in San Bernardino.

Bonshire described the history and culture of the Projects gang, its name, color, and symbols. He explained how gang admission works and the gang's activities. He estimated the Projects's membership was about 100. The primary activities of the Projects street gang are narcotics sales, firearm possession, burglaries, robberies, and shootings, including murders. Gang members commit crimes together. Committing a robbery elevates a gang member's status in several ways: it is "putting in work . . . for the gang"; it demonstrates active membership and "good standing"; it provides money to buy clothing and other status symbols and recruit new members; and it provides money to finance the gang's other activities.

Bonshire described three predicate offenses: a 2009 grand theft committed by gang member, Tommy Walker; two 2009 armed robberies with a gang enhancement committed by gang member, Cedric Timmons; and two 2008 robberies committed by gang member, Broderick Moore.

Based on hypothetical questions, Bonshire opined that the Jack in the Box crimes and flight were committed by gang members working together and would enhance their status and reputations by demonstrating their willingness to commit crimes with other gang members, their disregard of the law, and their willingness to do anything for the

5

gang. Choosing to commit the crimes outside the gang's territory facilitates commission of the crimes because it occurs away from the local police department familiar with the gang, its members, and the gang injunction. Bonshire said that the crimes would be discussed within the gang community and the community in general, thereby enhancing the gang's reputation and the fear and intimidation experienced by potential crime victims and witnesses. He also testified that gang members typically order victims to move around during robberies in order to intimidate them.

III

AGGRAVATED KIDNAPPING

Defendant challenges the sufficiency of evidence on all five of his convictions for aggravated kidnapping for robbery.[4] (§ 209, subd. (b)(1).) Under section 209, aggravated kidnapping, requires "movement of the victim . . . beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2); *In re Earley* (1975) 14 Cal.3d 122, 128.) Defendant contends the movement of all five employees was insufficient evidence of asportation because it was "merely incidental" to accomplishing the robbery and did not increase the risk of harm to them. As discussed below, we conclude that the conviction on count 1 for aggravated kidnapping of Bholat, the manager, should be reversed but the remaining convictions are affirmed.

---

[4] Implicit in our analysis is our conclusion that defendant committed kidnapping.

6

In *People v. Daniels* (1969) 71 Cal.2d 1119, 1138, the California Supreme Court cited a comment by "[t]he learned draftsmen" of the Model Penal Code about the "'absurdity of prosecuting for kidnapping in cases where the victim is forced into his own home to open the safe, or to the back of his store in the course of a robbery.'" The court reviewed this issue comprehensively in *People v. Vines* (2011) 51 Cal.4th 830, 869-871, in which defendant moved the employees between 80 and 200 feet and locked them downstairs in a walk-in freezer to accomplish a robbery. *Vines*, at page 869, applied a deferential standard of review. The *Vines* court commented that the two elements of incidental movement and increased risk of harm "are not mutually exclusive but are interrelated." (*Id.* at p. 870, citing *People v. Rayford* (1994) 9 Cal.4th 1, 12.) With regard to the first prong, the jury considers the scope and nature of the movement— including the actual distance a victim is moved—but there is no minimum distance. (*Vines,* at p. 870.) The second prong involves consideration of factors such as the decreased likelihood of detection, the danger inherent in the victims' foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (*Ibid.*) Although these principles seem fairly straightforward, California courts have applied them differently depending on the factual circumstances.

Some California cases have found the brief movement of robbery victims within a business establishment or residence insufficient to constitute aggravated kidnapping: "[I]ncidental movements are brief and insubstantial, and frequently consist of movement around the premises where the incident began." (*People v. Diaz* (2000) 78 Cal.App.4th 243, 247; *People v. Williams* (1970) 2 Cal.3d 894 [service station attendant locked inside

7

station bathroom and then moved around premises]; *People v. Mutch* (1971) 4 Cal.3d 389, 397-399 [movement of victims 30 to 40 feet through different rooms inside a business]; *People v. Morrison* (1971) 4 Cal.3d 442, 443 [movement of victim up and down stairs and into rooms of private residence]; *People v. Smith* (1971) 4 Cal.3d 426, 427 [movement of hotel clerk from office to second floor room of hotel]; *People v. John* (1983) 149 Cal.App.3d 798, 804, [movement of victim through different buildings in residence]; *People v. Hoard* (2002) [Fourth Dist., Div. Two] 103 Cal.App.4th 599, 607 [movement of two victims to the back office of a jewelry store]; *People v. Washington* (2005) 127 Cal.App.4th 290, 295-296 [a bank officer and teller moved into a bank vault].)

On the other hand, in cases that are factually similar, courts have concluded that brief movement was not incidental to robbery and increased the risk of harm to the victims. (*People v. James* (2007) 148 Cal.App.4th 446, 457, [coerced movement of one person when the intended target of the robbery was another person]; *People v. Corcoran* (2006) 143 Cal.App.4th 272, 279 [movement of victims about 10 feet from outside a bingo hall to a windowless back office].)

In *Vines*, as in this case, the forcible movement of the victims was also limited to movement inside the premises when a masked, armed robber herded a McDonald's restaurant manager and other employees into the manager's office where a safe was located. In *Vines*, however, the defendant also directed the victims from the front of the store, down a hidden stairway, and into a locked freezer. The scope and nature of this movement was not "merely incidental" to the commission of the robbery Additionally,

8

the victims suffered an increased risk of harm because of "the low temperature in the freezer, the decreased likelihood of detection, and the danger inherent in the victims' foreseeable attempts to escape such an environment." (*People v. Vines, supra,* 51 Cal.4th at p. 871.) On this record, the Supreme Court concluded sufficient evidence of asportation supported defendant's convictions for aggravated kidnapping.

It is difficult to extract a rule from these cases which seem to reach opposing conclusions. Nevertheless, a significant factor in all the cases is whether the movement—whatever the distance—was necessary to obtain control of the property and facilitate the robbery.

In *People v. Hoard, supra,* 103 Cal.App.4th at pages 601-602, 607, the defendant entered a jewelry store and moved two female employees 50 feet at gunpoint to the back office, where he bound them with duct tape. After confining them to the back room, he robbed the store. In reversing the convictions for aggravated kidnapping, this court noted that "[c]onfining the women in the back office gave defendant free access to the jewelry and allowed him to conceal the robbery from entering customers who might have thwarted him." (*Id*. at p. 607.) Accordingly, "[d]efendant's movement of the two women served only to facilitate the crime with no other apparent purpose." (*Ibid*.) The asportation of the victims was "merely incidental" to the robbery and did not increase the risk of harm.

In *People v. Washington, supra,* 127 Cal.App.4th at pages 295-296, two defendants robbed a bank. While armed with a gun, one defendant jumped over the front counter and directed two tellers to empty the cash drawers. The second defendant, also

9

armed, entered the bank manager's office and demanded money. The manager asked a teller to assist her in the vault. The manager and teller moved 14 or 15 feet into the vault. In holding that the movement of both victims was incidental to the robbery and did not increase the risk of harm, the court observed "robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises." (*Id.* at p. 300.) Crossing thresholds within the business to obtain property cannot elevate robbery to aggravated kidnapping. (*Ibid.*) Given that the primary object of a robbery is to obtain money, the movement of employees to that area to facilitate that crime must be deemed incidental. (*Id*. at p. 303.)

*Corcoran*, the bingo hall robbery, recognized some distinctions in its discussion of *Hoard* and *Washington.* In *Washington*, "movement was necessary to obtain the money and complete the robbery[. I]n the present case the victims were not taken to the location of the money the robbers sought to obtain. In *Washington*, 'there was no excess or gratuitous movement of the victims over and above that necessary to obtain the money in the vault.' (*Washington, supra*, 127 Cal.App.4th at p. 299.) In the instant case, the movement of the victims had nothing to do with facilitating taking cash from the bingo hall; defendant and his accomplice had aborted that aim, and their seclusion of the victims in the back office under threat of death was clearly 'excess and gratuitous.'" (*People v. Corcoran, supra,* 143 Cal.App.4th at pp. 279-280.) Similarly, when compared with *Hoard,* "the movement of the victims did not serve to facilitate the forcible attempted taking of money from the bingo hall. Rather, it served other purposes squarely recognized by the Supreme Court . . . as supporting a finding of a substantial increase in

10

danger: removing the victims from public view, decreasing the odds that the attempted robbery of cash from the bingo hall would be detected, increasing the risk of harm should any victim attempt to flee, and facilitating the robbers' escape. Indeed, there was no purpose for moving the victims to the back office except to facilitate these aims. In context, this movement was not merely brief and trivial; to the contrary, it substantially increased the risk of harm beyond that inherent in the crime of attempted robbery." (*Corcoran,* at p. 280.)

In this case, a masked, armed robber, later identified as defendant, burst into the Jack in the Box, making demands for money. Bholat, the manager, told defendant the money was in the safe and defendant demanded Bholat open the safe. At the same time, the robber directed the other four employees to go into the manager's office while Bholat opened the safe. Because there was very little money in the safe, Bholat—not defendant—instructed Cedillo to get money from the cash register at the counter. The evidence shows that defendant told Bholat to retrieve money from the safe in the office to facilitate the robbery, making the movement of Bholat incidental to the robbery of the safe.

Based on *Vines, Corcoran, Hoard,* and *Washington,* we conclude the brief movement of Bholat to the office where the safe was located was incidental to the robbery. As conceded by the People, there was no way to accomplish the robbery from the safe except for Bholat to go into the office. Furthermore, although there was also money in the cash register, when Cedillo went to the cash register, she was instructed to do so by Bholat, not defendant. However, the movement of the four employees, other

11

than Bholat, into the office, was not done to facilitate the robbery. Placing them in the enclosed space of the manager's office, out of public view, and threatened with a gun certainly caused them to suffer the threat of increased risk of harm. Accordingly, viewing the evidence in the light most favorable to the People (*People v. James, supra,* 148 Cal.App.4th at p. 453), the record was insufficient as a matter of law to support the verdict as to count 1 (Bholat) but substantial evidence supported the kidnapping convictions as to counts 2 through 5.

IV

DISPOSITION

We reverse count 1 for aggravated kidnapping and direct the trial court to impose the stayed sentence on count 6 and to forward a corrected abstract of judgment to the Department of Corrections and Rehabilitation. Otherwise, we affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

RICHLI
J.

12