Filed 04/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049574 |
| v. | (Super. Ct. No. 10NF1197) |
| SEAN PAUL DELACERDA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge. Affirmed in part, reversed in part, and remanded.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Sean Paul Delacerda of simple kidnapping (Pen. Code, § 207, subd. (a); all further undesignated statutory references are to this code), false imprisonment (§§ 236, 237, subd. (a)), assault with a firearm (§ 245, subd. (a)(2)), and domestic violence battery (§ 243, subd. (e)(1)), and found true allegations that in committing those crimes he personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)).  The court sentenced defendant to a term of 13 years in prison.

Defendant claims the kidnapping conviction must be reversed because the false imprisonment, assault with a firearm, and domestic violence battery are "associated crimes" as that phrase was used in *People v. Martinez* (1999) 20 Cal.4th 225 (*Martinez*), and the court erroneously failed to instruct the jury to consider whether the movement of the victim was merely incidental to the commission of those crimes.  He also claims the evidence of movement is insufficient to support the kidnapping conviction.

We conclude the false imprisonment is not an associated crime as a matter of law, and the assault with a firearm is not an associated crime as a matter of fact.  But we agree the evidence was sufficient to show the relationship between the kidnapping and the domestic violence battery meets the associated crime test set out in *People v. Bell* (2009) 179 Cal.App.4th 428, 438-439 (*Bell*).  So the court was required to instruct the jury to consider whether the movement of the victim was merely incidental to the commission of the domestic violence battery.  And, since the failure to so instruct was not harmless beyond a reasonable doubt, the kidnapping conviction must be reversed.

**FACTS**

*Prosecution Case*

The victim, Emily R., testified she and defendant, a deputy sheriff, began dating in the summer of 2009.  At first, their relationship was stable, but after awhile defendant became very possessive.  Every time Emily tried to do something on her own, defendant became depressed, told her he could not live without her, and wanted to commit suicide.

2

In the fall of 2009, Emily told defendant she wanted to end their relationship. He continued to call and send her text messages, in which he threatened to kill himself. Emily was worried about defendant, and she remained friends with him. They had sexual relations twice in November and twice in December 2009.

In April 2010, Emily spent the night with an ex-boyfriend. About 4:00 a.m., Emily awakened to her cell phone vibrating. There were several text and voicemail messages from defendant asking where she was. Emily sent him a text message saying she was fine and would call him in the morning.

Defendant responded that she needed to call him immediately. She did call, but she refused to tell him where she was. Defendant said, "I need to know where you are right now. Why aren't you telling me the truth right now?" She replied, "We are not together anymore. Doesn't matter where I am. It's none of your business. You need to stop this. You need to knock it off. You need to stop."

The next afternoon, Emily returned to her apartment. She was concerned defendant might be there, so she drove around looking for his car. Not seeing it, she parked and went in. When she unlocked her door, she saw defendant lying on the floor with a blood stain on his shirt, petting her cat.

Emily asked defendant, "What are you doing here?" He told her he wanted to talk. Emily responded, "I don't want you here. You need to leave." Defendant said he was upset and depressed. Defendant accused Emily of cheating on him. Emily reminded him they were no longer dating. She told him her whereabouts were none of his business, and he should stop trying to keep track of her.

After Emily told him several times to leave, he said, "Not yet," and added, "I wanted you to be here to see this." He took a revolver from his pocket, put one bullet in it, and stood between her and the front door. Emily walked towards the front door, and asked, "What are you doing?" Defendant blocked the door and said, "No. I'm not going to hurt you" and "I just want to talk."

3

Defendant removed the bullet from the gun, placed it on a table by the front door and said, "I want to read your e-mails." Emily asked, "If I let you read my e-mails will you leave me alone forever?" He said, "I promise. I won't bother you again."

Emily went in the bathroom and locked the door. Defendant banged on the door and asked her what she was doing. When Emily came out, defendant was standing by the bathroom door. He said, "Let's read your e-mails. Let's do this." They both went into her bedroom and sat down on the bed.

Emily opened her laptop computer. Defendant ordered her to show him her e-mails. Emily threw the laptop at him and tried to run away. When she was halfway across the apartment, he tackled her and they both fell to the floor.

Emily tried to scream but defendant put his hands over her mouth and nose so it was difficult for her to breathe. Defendant picked Emily up, and marched her back to the bedroom. He put the laptop on her lap and said, "Let's keep looking. I want to see." He pointed to the e-mails he wanted Emily to open.

As defendant was reading one of them, Emily threw the computer at him again and ran toward the front door. Defendant again tackled her, put his hands over her nose and mouth, dragged her back to the bedroom, and put her back on the bed. This time, defendant held onto the computer, and told Emily to sit down and shut up.

While defendant was reading her e-mails, Emily ran for a third time. She was near the front door when defendant tackled her to the ground once more. Defendant rolled her onto her back. Emily screamed. Defendant got on top of her. He put his hands over her mouth, and said, "Shut the fuck up" and "Okay, I've got to do this."

Defendant grabbed the gun with his right hand while holding Emily down with his left. He opened the cylinder, put the bullet back in the gun, snapped it shut, and put the gun in his mouth. Emily begged defendant not to do anything. Defendant put his hands over her mouth again and pulled the trigger. The gun clicked but nothing happened. Emily screamed.

Defendant said, "Shut the fuck up. You need to shut up." He pointed the gun at her face. Defendant kept telling Emily to "shut up" while she pleaded with him, "Please don't do this" and "Please just stop." Emily tried to deter defendant by warning him that the neighbors might have overheard the commotion and contacted the police. Defendant said, "You're right. Someone had to have heard that. We have to end this."

Emily said, "I'll tell you anything you want." "Just please stop." Defendant rolled Emily over, dragged her back into the bedroom, shoved her into the closet, and blocked her exit. Defendant got in after her and said, "You need to shut the fuck up. I'll be done in a minute." Emily promised she would be quiet. He picked up the laptop and started going through Emily's e-mails again.

When defendant focused on the e-mails, Emily ran out of the closet and into the living room. She grabbed her car keys, went out the front door and down the stairs, got into her car and locked the doors. Defendant appeared and pounded on the driver's side door, yelling, "Get the fuck out of the car" and "What are you doing?"

Emily put the car in reverse. Defendant jumped on the hood. Emily backed up and he fell off. Defendant got up, stood in front of the car and jumped back on the hood. Emily sped up and defendant fell off the hood again. As Emily exited her apartment complex, she dialed 911. She then drove to a nearby police department.

Police Detective Christopher Wren went to Emily's apartment. He found four .38-caliber rounds on a table near the front door. There was a note pad on a coffee table on which defendant had written, "goodbye." Another detective, Ronald Bair, observed the distance from the front door to the closet was about 22 feet. Officer David MacShane estimated the distance from where Emily was tackled near the front door to the closet was approximately 30 to 40 feet.

As a result of the incident, Emily had bruises around her mouth, and a large bruise on her buttocks. Also, her chest was red and there were scratch marks on her arm.

5

*Defense Case*

The defense case consisted largely of defendant's own testimony. He gave a vastly different account of the events, one in which he committed none of the charged offenses. He said Emily was not truthful. Of particular relevance, he claimed her testimony that he dragged her into the bedroom and pushed her into the closet was a lie. He said he only touched her once, when they struggled over her computer.

## KIDNAPPING INSTRUCTION AND ARGUMENT

The prosecutor and the defense attorney agreed the court should give CALCRIM No. 1215, the pattern jury instruction for simple kidnapping. With respect to the substantial distance component in the asportation element of this instruction, the prosecutor and the defense attorney also agreed the court should delete the optional language pertaining to movement merely incidental to an associated crime, "since that doesn't apply."[1] The court gave the jury the modified instruction as agreed.

The prosecutor argued the kidnapping occurred after Emily ran for the third time, and after defendant tackled and pointed the gun at her, when defendant dragged Emily from near the front door to the bedroom and shoved her into the closet. The defense countered there was no kidnapping in this case. Emily's testimony about being dragged to the bedroom and shoved into the closet was not credible. No such dragging movement ever occurred. Further, even if her testimony were to be believed, and the dragging movement had occurred, that movement was not substantial.

---

[1] On this point the unmodified version of this instruction states in relevant part: "*Substantial distance* means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. [Thus, in addition to considering the actual distance moved, you may also consider other factors such as [*whether the distance the other person was moved was beyond that merely incidental to the commission of <insert associated crime>*], whether the movement increased the risk of [physical or psychological] harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection.]" (CALCRIM No. 1215, italics added.) The italicized language is what the court deleted in this case.

6

**DISCUSSION**

*1. Instruction on Movement Incidental to Associated Crimes*

Defendant contends the court erroneously failed to instruct the jury to consider whether defendant's movement of Emily was merely incidental to his commission of false imprisonment, assault with a firearm, and domestic violence battery, because all of those offenses are associated crimes. We agree in part.

*a. General Principles and Standard of Review*

A trial court bears a sua sponte duty to instruct the jury on the essential elements of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 480), and "'on the general principles of law governing the case, i.e., those principles of law *commonly* or closely and openly connected with the facts of the case before the court'" (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530). "An appellate court reviews the wording of a jury instruction de novo" (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574), and determines whether "the instructions are complete and correctly state the law" (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585).

"Both simple kidnapping and aggravated kidnapping (except kidnapping for ransom or extortion) have an asportation element. [Citation.] But the . . . asportation element of simple kidnapping is not the same as that for aggravated kidnapping." (*Bell*, *supra*, 179 Cal.App.4th at p. 435.) Further, while the asportation element for aggravated kidnapping is well defined, "the 'asportation requirement for simple kidnapping has historically been less clear'[Citation] . . ." (*Id.* at p. 436.) Even so, for simple kidnapping "an 'associated crime,' as that phrase was used by the *Martinez* court, is *any* criminal act the defendant intends to commit where, in the course of its commission, the defendant also moves a victim by force or fear against his or her will." (*Id*. at pp. 438-439.)

Finally, failure to instruct on movement merely incidental to an associated crime violates "defendant's right to a correct jury instruction on all the elements of the offense of simple kidnapping." (*Bell*, *supra*, 179 Cal.App.4th at p. 439.)

7

*b. False Imprisonment and Assault with a Firearm*

The basic premise of defendant's jury instruction argument is faulty in two respects. As we will explain, false imprisonment and assault with a firearm are not associated crimes of simple kidnapping in this case. Hence, the court was not required to instruct the jury to consider whether defendant's movement of Emily was merely incidental to his commission of those two offenses.

"We start with the observation that the crime of false imprisonment is necessarily included in the crime of kidnapping." (*People v. Apo* (1972) 25 Cal.App.3d 790, 796 (*Apo*); see also *People v. Magana* (1991) 230 Cal.App.3d 1117, 1120-1121.) "It would be absurd for a *lesser* included offense to so subsume the greater offense as to prevent the greater from happening. For this reason alone [defendant's] contention is not well taken." (*Apo*, *supra*, 25 Cal.App.3d at p. 797.)

*Apo* is directly on point and provides explicit guidance. There, nineteen students were convicted of simple kidnapping, false imprisonment, and conspiracy to commit those crimes. (*Apo*, *supra*, 25 Cal.App.3d at pp. 792-793.) "The charges in question grew out of a claim by black students at the college that a freshman football coach had, during the course of a game, kicked or otherwise abused a black football player . . . ." (*Id.* at p. 793.)

After a heated discussion about the incident with a group of students in a conference room in the physical education building, the victims, two professors and the director of athletics, "were then marched from the physical education building to the administration building, a distance of some 700 yards . . . ." (*Id.* at pp. 793-794.) During the march, the victims were continually jostled or shoved when they tried to delay or stop. "Each of them went unwillingly; each was afraid; from time to time statements to the effect 'Move along whitey or we will stick you' were made. During the forced trek a black student hit a white student on the jaw." (*Id.* at p. 794.)

8

"The group marched through the first floor of the administration building, outside again and back inside. The professors were then forced to walk to the fifth floor of the administration building where the president and other top officers of the college had their offices. They were kept on the fifth floor for a matter of some hours until the president of the college arrived . . . ." (*Apo*, *supra*, 25 Cal.App.3d at p. 794.)

On appeal, the defendants argued "the act of taking [the victims] from the physical education building to the administration building did not constitute the crime of kidnapping but rather was an asportation incidental to the crime of false imprisonment . . . ." (*Apo*, *supra*, 25 Cal.App.3d at p. 795.) The *Apo* court rejected this argument for two reasons. First, as a matter of fact, substantial evidence supported the conclusion that the movement substantially increased the risk of harm to the victims. (*Id.* at pp. 795-796.) Second, as a matter of law, the movement was not merely incidental to the false imprisonment. (*Id.* at pp. 796-797.)

Defendant asserts the *Apo* court's substantial evidence finding alone was sufficient to sustain the convictions, so the analysis needed to go no further and, as a result, the *Apo* court's second reason for rejecting the claim - that the movement was merely incidental to the false imprisonment as a matter of law - is just dicta. Not so. The two stated reasons for the result in *Apo* are both separate and sufficient.

Defendant also claims our reading of *Apo* leads to an apparent anomaly: "While forcibly moving a store clerk who tried to run when he saw a robbery was about to occur and bringing him back to the register would not constitute a kidnapping, though it would constitute robbery; whereas, forcibly moving Emily back to the laptop when she tried to escape the false imprisonment would be a kidnapping." He cites three cases to support this claim. (*In re Crumpton* (1973) 9 Cal.3d 463; *People v. Smith* (1971) 4 Cal.3d 426; *People v. Morrison* (1971) 4 Cal.3d 442.) All three of these cases involved kidnapping for robbery, not simple kidnapping, and were decided based upon *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*).

9

In *Daniels*, our Supreme Court announced the rule that aggravated kidnapping requires movement of the victim which is not merely incidental to the commission of the underlying crime and which increases the risk of harm to the victim over and above that necessarily present in the underlying crime. (*Daniels*, *supra*, 71 Cal.2d at pp. 1139-1140.) Subsequent cases have clarified the *Daniels* rule "is not applicable to kidnapping charged as a violation of section 207 [simple kidnapping] but only to charges . . . bottomed on section 209, commonly referred to as aggravated kidnapping." (*People v. Stanworth* (1974) 11 Cal.3d 588, 598; see also *Martinez*, *supra*, 20 Cal.4th at p. 234.) Hence, "*Daniels* clearly does not bar the kidnapping count." (*Apo*, *supra*, 25 Cal.App.3d at p. 797.) In sum, there is no anomaly as defendant contends.

Next defendant observes the *Apo* court did not have the benefit of *Martinez* and *Bell*. He contends the false imprisonment in *Apo* would not be an associated crime under current law as a matter of fact. But neither *Martinez* nor *Bell* cited *Apo*, and nothing in either of them undermines the rationale behind the *Apo* holding that lesser included offenses cannot be associated crimes as a matter of law. The point of the associated crime rule is to determine "whether more than one crime has been committed" (*Martinez*, *supra*, 20 Cal.4th at p. 237), but convictions for both a greater and a lesser included offense based upon the same conduct are always prohibited (*People v. Milward* (2011) 52 Cal.4th 580, 589). In this context the associated crime rule is superfluous.

Turning to the assault with a firearm, the People were required to prove: "The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person." (CALCRIM No. 875.) A review of the evidence reveals the only such act occurred when defendant pointed the gun at Emily, after she ran for the third time and he tackled her near the front door, but before he dragged her back into the bedroom. So this act involved no movement at all, and was complete before the movement which comprised the kidnapping began. Consequently, this act was not an associated crime as a matter of fact.

10

*c. Domestic Violence Battery*

Looking at the domestic violence battery, the People were required to prove: "The defendant willfully touched [Emily] in a harmful or offensive manner." (CALCRIM No. 841.) A review of the evidence reveals multiple acts of harmful or offensive touching that occurred, before, during, and after the dragging movement which comprised the kidnapping. But none of these acts of touching involved movement of Emily by force or fear against her will, except the touching which occurred during the dragging movement itself. At trial, Emily described that touching as follows:

"[Emily:] He rolled me back over and got me behind my shoulders again and dragged me. I was completely limp. He dragged me back into the bedroom.

"[¶] . . . [¶]

"[Prosecutor:] And how was your body in relation to his body?

"[Emily:] I'm facing away from him. He's facing – we are both facing the same way. My feet are on the ground and he's dragging me like that.

"[Prosecutor:] And is your body touching his body?

"[Emily:] Completely, yeah. I backed down to my butt basically, and my legs were dragged.

"[¶] . . . [¶]

"[Prosecutor:] So he had both his hands kind of under your armpits and either holding you with his arms forward or one across your chest?

"[Emily:] Correct.

"[¶] . . . [¶]

"[Prosecutor:] And what were you doing as he was dragging you?

"[Emily:] I was trying to scream. And then he put his hand over my mouth and I just went limp and I stopped. And then he stopped choking or covering my mouth so I just went limp."

11

These acts of harmful or offensive touching are criminal acts which "the defendant intend[ed] to commit where, in the course of [their] commission, the defendant also move[d] a victim by force or fear against his or her will." (*Bell*, *supra*, 179 Cal.App.4th at pp. 438-439.)  Moreover, a comparison of these acts to the acts in *Bell* solidifies our conclusion the domestic violence battery here is an associated crime.

In *Bell*, the defendant was convicted of evading a police officer while driving recklessly (Veh. Code, § 2800.2), simple kidnapping, and other offenses.  On appeal, he successfully challenged his kidnapping conviction, because the court did not instruct the jury regarding movement merely incidental to an associated crime.  (*Bell*, *supra*, 179 Cal.App.4th at p. 439.)  The result in *Bell* turns on its unusual facts.

The defendant, a parolee, was driving in his car with his ex-wife, Anna Jennings.  Jennings had alerted authorities the defendant would be coming to her office, so they could arrest him on an outstanding warrant.  As the defendant and Jennings arrived at her office:  "Officer Oliveras, . . . [¶] . . . pulled out his gun, identified himself as an officer, and yelled, 'Stop, put your hands up.'  Jennings, who had opened the car door . . . screamed, 'Oh, my God.'  Defendant looked straight at Oliveras . . . accelerated with his 'tires screeching,' and . . . made a 'very fast accelerated U-turn' and fled the opposite way down the street. . . .  [¶] Jennings offered two different versions of what happened next. . . .  At trial, she testified that 'in a matter of feet,' defendant stopped at a red light, put his arm in front of her for her safety, and let her out.  But . . . when questioned at the scene, Jennings told an officer she asked 'defendant to stop the car about three times,' but he said, 'No.'  Shortly 'after the U-turn was completed,' he 'put his right arm across her to restrain her.'"  "Under both versions, defendant stopped at an intersection about 70 yards away and let Jennings out of the vehicle.  [¶] Alone in the car, defendant led the police on a chase during which he went through stop signs and a red light without stopping . . . [and] . . . reached speeds of between 70 to 80 miles per hour." (*Bell*, *supra*, 179 Cal.App.4th at pp. 432-433.)

The *Bell* court concluded: "[T]he evidence here was sufficient to show the relationship between the kidnapping and the evasion meets our [associated crime] test. The evidence supported a finding that defendant intended to evade the police and did so recklessly. And from the evidence, the jury could have found that in the course of the evasion, Jennings was moved by force or fear against her will. Under these facts, the court should have instructed the jury that . . . in determining whether defendant's movement of Jennings was substantial, they could consider whether the movement was merely incidental to the crime of evasion . . . ." (*Bell*, *supra*, 179 Cal.App.4th at p. 439.)

All of the same can be said in this case. The evidence here was sufficient to show the relationship between the kidnapping and the domestic violence battery meets the associated crime test under *Bell*. The evidence supported a finding defendant willfully touched Emily in a harmful or offensive manner. And from the evidence, the jury could have found that in the course of that harmful or offensive touching, Emily was moved by force or fear against her will. Under these facts, the court should have instructed the jury that in determining whether defendant's movement of Emily was substantial, they could consider whether the movement was merely incidental to the crime of domestic violence battery. (*Bell*, *supra*, 179 Cal.App.4th at p. 439.)

Furthermore here, as in *Bell*, the error here was prejudicial. The court's failure to charge the jury on the substantiality of the movement in relation to the domestic violence battery offense precluded the jurors from considering whether defendant's dragging of Emily and stuffing her into the closet was merely incidental to his offense of domestic violence battery. The People point us to no other jury instructions, jury findings, or counsel's arguments showing the jurors knew they had to acquit defendant of kidnapping if they found his movement of Emily was not substantial, taking into account (as one factor among others) whether his movement of Emily was merely incidental to the domestic violence battery. Therefore, "The error was *not* harmless beyond a reasonable doubt." (*Bell*, *supra*, 179 Cal.App.4th at p. 440.)

13

For these reasons, the kidnapping conviction must be reversed. In addition, because we have considered these claims on the merits, we need not consider defendant's alternative claim that his trial counsel rendered him ineffective assistance by failing to present and preserve these claims in the trial court.

2. *Sufficiency of Evidence to Support Kidnapping*

Defendant contends the distance defendant dragged Emily was so insubstantial under the circumstances in which it occurred, that it was not appropriate to even submit the substantial distance issue to the jury. We are not persuaded.

### a. Standard of Review

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We do not reevaluate witness credibility or resolve conflicts in the evidence, and the testimony of one witness is sufficient to support a conviction, unless it is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

### b. Evidence the Movement of Emily Was Substantial

Recall Bair observed the distance from the front door to the bedroom closet was about 22 feet, while MacShane estimated the distance from where Emily was tackled near the front door to the closet was approximately 30 to 40 feet. Further recall, Emily testified she was close to the front door when defendant tackled her to the ground and she screamed. Defendant put his hands over her nose and mouth, and told her to, "Shut the fuck up." When he put the gun in his mouth and pulled the trigger Emily screamed again. Defendant told her again, "Shut the fuck up. You need to shut up."

14

Defendant pointed the gun at Emily's face and kept telling her to "shut up" while she pleaded with him, "Please don't do this. Please stop." Emily then warned him the neighbors might have overheard the commotion and contacted the police. Defendant responded, "You're right. Someone had to have heard that." At that point defendant rolled Emily over, dragged her back into the bedroom, and shoved her into the closet.

There is nothing physically impossible or inherently improbable about any of this testimony, and viewing it in the light most favorable to the judgment as we must, the evidence shows defendant dragged Emily for an actual distance at least 22 feet and perhaps as much as 40 feet. This distance was neither slight nor trivial. In addition, the jury could reasonably infer the reason for the movement was to decrease the likelihood of detection. Likewise, the jury could reasonably deduce the movement increased the risk of physical or psychological harm to Emily, increased the danger of a foreseeable escape attempt by her, and gave defendant a greater opportunity to commit additional crimes against her. Lastly, the jury could reasonably conclude the movement of Emily was not merely incidental to the domestic violence battery.

Under these circumstances, a reasonable trier of fact could find defendant's movement of Emily was substantial. (*Martinez*, *supra*, 20 Cal.4th at pp. 235-237; *Bell*, *supra*, 179 Cal.App.4th at pp. 436-437; *Cotton v. Superior Court* (1961) 56 Cal.2d 459.)

None of the cases cited by defendant support a contrary conclusion. *Daniels*, *People v. Dominguez* (2006) 39 Cal.4th 1141, *In re Earley* (1975) 14 Cal.3d 122, *People v. Hoard* (2002) 103 Cal.App.4th 599 and *People v. Washington* (2005) 127 Cal.App.4th 290, all considered the sufficiency of asportation evidence to support aggravated kidnapping convictions. But, as we have already explained, "the standard for proving the asportation element of simple kidnapping is not the same as that for aggravated kidnapping." (*Bell*, *supra*, 179 Cal.App.4th at p. 435.)

Based upon all of the foregoing, we conclude the evidence is sufficient to support the verdict that defendant was guilty of kidnapping beyond a reasonable doubt.

15

## DISPOSITION

The simple kidnapping conviction and the judgment based in part thereon, are reversed. The false imprisonment, assault with a firearm, and domestic violence battery convictions, not having been challenged on appeal, are affirmed. In light of this disposition, the court order vacating the false imprisonment conviction for sentencing purposes under *People v. Milward*, *supra*, 52 Cal.4th at page 589, solely because false imprisonment is a lesser included offense to simple kidnapping, is also set aside pending retrial on the simple kidnapping charge or resentencing on the remaining convictions.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.

16